1   Ely Goldin (*Pro Hac Vice Pending*)
    egoldin@foxrothschild.com
2   W. Christian Moffitt (*Pro Hac Vice Pending*)
    cmoffitt@foxrothschild.com
3   Michael A. Sweet (SBN 184345)
    msweet@foxrothschild.com
4   Jack Praetzellis (SBN 267765)
    jpraetzellis@foxrothschild.com
5   **FOX ROTHSCHILD** LLP
    345 California Street, Suite 2200
6   San Francisco, CA 94104 - 2734
    Telephone:     415.364.5540
7   Facsimile:     415.391.4436

8   Attorneys for Plaintiff NEAS LIMITED,
    individually in its own right and
9   derivatively on behalf of NITOL SOLAR
    LIMITED, and ANDREY TRETYAKOV

10

11                 UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                      SAN JOSE DIVISION

14

| | |
|---|---|
| 15  NEAS LIMITED, individually in its own right and derivatively on behalf of NITOL SOLAR LIMITED; and ANDREY TRETYAKOV, | Case No. _____ |
| 16 | **COMPLAINT FOR:** |
| 17  Plaintiffs, | 1) **RICO;** |
| | 2) **BREACH OF CONTRACT;** |
| 18  v. | 3) **BAD FAITH DISPOSAL OF COLLAT-ERAL;** |
| 19  OJSC RUSNANO; RUSNANO MANAGEMENT COMPANY, | 4) **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING;** |
| 20  LLC; RUSNANO CAPITAL, A.G.; | 5) **EQUITABLE ESTOPPEL;** |
| 21  RUSNANO CAPITAL, LLC; RUSNANO USA, INC.; | 6) **VIOLATION OF §74 OF THE COMPA-NIES ACT OF 1991 OF JERSEY;** |
| 22  FONDS RUSNANO CAPITAL, A.G.; ANATOLY CHUBAIS; | 7) **VIOLATION OF §75 OF THE COMPA-NIES ACT OF 1991 OF JERSEY;** |
| 23  OLEG KISELEV; IRINA RAPPAPORT; | 8) **VIOLATION OF §141 OF THE COMPA-NIES ACT OF 1991 OF JERSEY;** |
| 24  SERGEY POLIKARPOV; VALERY ROSTOKIN; | 9) **ACCOUNTING;** |
| | 10) **CONSTRUCTIVE TRUST;** |
| 25  SHERIGO RESOURCES LIMITED; and JOHN DOES 1 THROUGH 10 | 11) **FRAUD;** |
| | 12) **NEGLIGENT MISREPRESENTATION;** |
| 26  Defendants, | 13) **BREACH OF FIDUCIARY DUTY;** |
| | 14) **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;** |
| 27  and | 15) **FRAUDULENT TRANSFER;** |
| | 16) **CIVIL CONSPIRACY;** |
| 28 | 17) **ACTION TO PIERCE THE CORPO-** |

NITOL SOLAR LIMITED,

              Nominal Defendant.

**RATE VEIL;**
18) **VIOLATION OF § 17200 OF THE CALI-FORNIA BUSINESS AND PROFES-SIONS CODE**

**DEMAND FOR JURY TRIAL**

Plaintiffs, Neas Limited ("Neas"), in its own right and derivatively on behalf of Nitol Solar Limited ("Nitol"), and Andrey Tretyakov ("Tretyakov"), by and through their undersigned counsel and pursuant to Fed. R. Civ. P. 8(a)(2), file this Complaint against the defendants herein, and in sup-port of the Complaint, aver as follows:

**PRELIMINARY STATEMENT**

1.      This is an action for damages stemming from the illegal takeover of Nitol, a valuable polysilicon producer, by OJSC RUSNANO ("RUSNANO"), a Russian state-owned enterprise.

2.      At all relevant times, Neas was a minority shareholder in Nitol, holding approximate-ly 4,703,125 shares of common stock.

3.      In or around 2009, Nitol entered into two revolving credit facilities, one with RUSNANO for approximately RUB 4.5 billion (the "RUSNANO Credit") and one with Alpha Bank ("Alpha") for approximately RUB 7.5 billion (the "Alpha Credit").

4.      Pursuant to an inter-creditor arrangement, RUSNANO assumed the role of lead lend-er and, under the guise of staffing Nitol with experienced personnel, appointed various insiders (the "Nitol Insiders") to manage Nitol's affairs.

5.      Instead of running Nitol in a manner designed to maximize shareholder value, the Ni-tol Insiders grossly mismanaged Nitol's affairs, diverted valuable corporate assets and usurped for themselves valuable corporate opportunities with RUSNANO's knowledge and approval, while drawing exorbitant compensation and benefits funded largely by the aforementioned credit facilities.

6.      In addition, while diverting funds and opportunities intended for Nitol's development, the Nitol Insiders purposefully caused Nitol to default on the RUSNANO Credit while concealing the effects of the default from the Nitol board and/or the other shareholders.

7.      Effectively, the Nitol Insiders – who were loyal to and acting upon the instructions of RUSNANO – allowed Nitol to default on $6 million in interest payments due under the RUSNANO

Credit.

8.     Meanwhile, the Nitol Insiders assured Nitol that the default was non-material and technical and that the interest payments would be deferred for at least one and possibly two years while Nitol and RUSNANO negotiated a much more substantial infusion of capital through a direct investment.

9.     And thus, for a period of nine months in 2011, the Nitol Insiders engaged in protracted sham negotiations with RUSNANO over the terms of the more substantial capital infusion while allowing deferred interest to accrue and while assuring Nitol and its shareholders that the accrual was harmless.

10.     These negotiations culminated in a key meeting of September 26, 2011, during which Nitol Insiders, acting as representatives of RUSNANO, assured Nitol that RUSNANO funding would be forthcoming imminently. Nitol reasonably relied upon those assurances, given that they were coming from its own board member.

11.     However, instead of procuring the promised capital infusion, on September 26, 2011, RUSNANO suddenly and unexpectedly declared a default on the RUSNANO Credit based on Nitol's supposed failure to pay the accrued interest.

12.     Immediately following the declaration of default, RUSNANO – using rights and powers supposedly arising under a certain pledge agreement – effectuated a private extrajudicial foreclosure on the shares of INSQU Production Limited ("INSQU"), Nitol's principal operating company, which had been pledged as collateral for the RUSNANO Credit.

13.     RUSNANO then quickly transferred INSQU's shares to a British Virgin Islands entity known as Sherigo Resources Limited ("Sherigo"), which supplanted Nitol's existing shareholders, including, Neas, and extinguished all shareholder value.

14.     RUSNANO's takeover of Nitol was carried out in a manner that is completely contrary to law. As set forth more fully below, RUSNANO (i) conducted sham negotiations with hopelessly conflicted Nitol Insiders, thus frustrating Nitol's ability to save its principal asset; (ii) falsely promised to defer accrued interest and to infuse new capital; (iii) conducted an extra-judicial foreclosure vis-à-vis the INSQU shares in "satisfaction" of the accrued interest when the value of the shares

1    dramatically exceeded any "past-due" amounts; and (iv) fraudulently transferred the INSQU shares
2    to an off-shore subsidiary.

3        15.    Moreover, RUSNANO abused its role as lender by appointing key management fig-
4    ures, who then breached their fiduciary obligations to Nitol by putting RUSNANO's interests ahead
5    of their legal responsibilities.  In so doing, RUSNANO materially aided a breach by the Nitol Insid-
6    ers of their fiduciary obligations and is therefore jointly liable with the Nitol Insiders for the loss of
7    the investment.

8        16.    Finally, RUSNANO's illegal takeover of INSQU reflects a well-planned and highly-
9    coordinated course of conduct that could not have occurred without the express and/or tacit approval
10   of the John Doe Defendants who are fully complicit and personally liable for the substantial eco-
11   nomic harm caused by the loss of this valuable investment as well as punitive and/or exemplary
12   damages arising from the their outrageous conduct.

13       17.    As a result, Neas seeks damages in excess of USD $10,000,000, and other legal and
14   equitable relief, and in support thereof avers as follows.

15                              **THE PARTIES**

16       18.    Plaintiff **Neas** is a Cyprus corporation with a registered office at 35 Eagle Star House,
17   6th Floor, P.C. 3030, Cyprus.

18       19.    Plaintiff **Tretyakov**, is the ultimate beneficial owner of Neas and is a citizen of the
19   United States of American and a resident of the State of Connecticut residing in Stamford.

20       20.    Defendant **RUSNANO** is an open joint-stock company that, upon information and
21   belief, is organized under the laws of the Russian Federation.  RUSNANO is a state-owned corpora-
22   tion whose interests and commercial activities are controlled, directly and/or indirectly, by the Gov-
23   ernment of the Russian Federation (the "RF").  RUSNANO maintains a principal place of business at
24   10A Prospekt 60-letiya Oktyabrya, Moscow, Russia 117036.  RUSNANO also maintains business
25   offices in Herzilya Petuch, Israel and in the United States at 3000 Sand Hill Road, 2-240, Menlo
26   Park, CA 94025.  *See* www. RUSNANO.com/about.

27

28

21.     Defendant **RUSNANO Management Company, LLC**[1] ("RMC") is, upon infor-mation and belief, a Limited Liability Company organized under Russian law with a principal place of business at 10A Prospekt 60-letiya Oktyabrya, Moscow, Russia 117036.   RMC manages RUSNANO's worldwide assets including, without limitation, its projects and investments in the United States which are estimated at USD $2 billion.

22.     Defendant **RUSNANO Capital, A.G.** ("RCA") is a Swiss corporation with a regis-tered office c/o Interhold AG, Othmarstrasse 8, 8008 Zürich, Switzerland.  RCA is a subsidiary of RUSNANO whose primary purpose capitalize and oversee control of RUSNANO investment pro-jects including, without limitation, its projects and investments in the United States.

23.     Defendant **RUSNANO Capital, LLC** ("RCL") is, upon information and belief, a Russian limited liability company with a registered office at 10A Prospekt 60-letiya Oktyabrya, Moscow, Russia 117036.  RCL is a subsidiary of RUSNANO and a sister company to RCA.   Its primary purpose is to capitalize and oversee control of RUSNANO investment projects including, without limitation, its projects and investments in the United States.

24.     Defendant **RUSNANO USA, Inc**. ("RUSNANO USA") is a Delaware Company with a principal place of business at 3000 Sand Hill Road, 2-240, Menlo Park, CA 94025.  RUSNANO USA is a subsidiary of RUSNANO.

25.     Defendant **Fonds RUSNANO Capital, S.A.** ("FRC") is a Luxembourg company with a registered office at 6 Avenue Guillaume L, 1650 Luxembourg, Luxembourg.

26.     RUSNANO, RMC, RCA, RCL, RUSNANO USA, and FRC are collectively referred to as the "RUSNANO Group."

27.     Defendant **Anatoly Chubais** ("Chubais") is a Russian citizen who maintains a princi-pal place of business at 10A Prospekt 60-letiya Oktyabrya, Moscow, Russia 117036.  Chubais is the Chairman of the Executive Board of RUSNANO and one of the principal architects of Russian pri-vatization following the collapse of the former Soviet Union.  Chubais also sits on the advisory

---

[1] Unless otherwise specified, the designation "LLC" as used in connection with a Russian company is the English-language translation of the term *Obschestvo S Ogranichennoi Otvetstven-nost'yu* which literally translates to *Organization with Limited Liability.*

council of JP Morgan Chase ("JPM").  Chubais exercises dominion and control over the RUSNANO Group.

28.     Defendant **Oleg Kiselev** ("Kiselev") is the Deputy Chairman of the Governing Board of RUSNANO and a member of its Strategy Committee.  Defendant Kiselev also serves as a board member of RMC.

29.     Defendant **Irina Rappaport** ("Rappaport") is, upon information and belief, a U.S. citizen and/or a permanent resident of the United States and is the Chief Executive Officer and Chairwoman of the Advisory Board of RCL, and a Board Member of FRC.  Rappaport, who obtained her MBA from the University of San Francisco, also exercises dominion and control over the RUSNANO Group.

30.     Chubais, Kiselev and Rappaport are referred to, from to time, as the "RUSNANO Control Persons." THE RUSNANO Control Persons are, upon information and belief, the architects of the fraudulent scheme described herein.

31.     Defendant **Sergei Polikarpov** ("Polikarpov") is a Russian citizen who maintains a principal place of business at 10A Prospekt 60-letiya Oktyabrya, Moscow, Russia 117036.  Upon information and belief, Polikarpov is a Managing Director at RUSNANO.  He served as Nitol Solar Limited board member since March of 2009, having been appointed by RUSNANO to oversee its investment in Nitol.  Polikarpov also serves on the board of NeoPhotonics Corporation (NYSE: NPTN), a publically traded technology company headquartered in San Jose, California with approximately 3,000 employees.

32.     Defendant **Valery Rostokin** ("Rostokin") is a Russian citizen who maintains a place of business at 2a Krasnokazarmennaya Ulitsa, Moscow, Russia 111250.  Rostokin is the former CEO and is a current member of the Board of Directors of Nitol.  As discussed more fully below, Rostokin is a Nitol Insider who materially participated in the Illegal Scheme complained of herein.

33.     Defendants Polikarpov and Rostokin are referred to as the "Nitol Insiders".  The Nitol Insiders are operatives who carried out the fraudulent scheme.

34.     Defendant **Sherigo Resources Limited** ("Sherigo") is a company organized under the laws of the British Virgin Islands and maintains a registered office care of Totalserve Trust Compa-

ny, Limited, 197 Main Street, Road Town, BVI.

35.     Defendants **John Does 1 through 10** (the "John Doe Defendants") are persons and/or business entities that aided and abetted the Nitol Insiders and who materially participated in the events complained of herein but whose identities are as of yet unknown to Plaintiff.    Plaintiff respectfully reserves the right to amend the caption and identify the John Doe Defendants by name once their identities have been ascertained through discovery.

36.     Nominal Defendant **Nitol Solar Limited** ("Nitol") is a public company organized under the laws of the Bailiwick of Jersey, with a registered office at P.O. Box 437, 4th Floor, 13 Castle Street, St. Helir, Jersey JE40ZE.

## SUBJECT MATTER JURISDICTION

37.     This Court has original subject matter jurisdiction over all claims pursuant to 28 U.S.C. § 1331 based on federal question and 28 U.S.C. § 1332 based on complete diversity of citizenship.  This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a).

## INTRADISTRICT ASSIGNMENT

38.     The basis for assigning this action to the San Jose Division is that a defendant is located here.

## PERSONAL JURISDICTION

39.     This Court has personal jurisdiction over each of the Defendants. Each of the Defendants, upon information and belief, has conducted business in, and has had continuous and systematic contacts with, the State of California and the United States of America. By way of example and, without limitation:

        (a)     **The RUSNANO Group:**

                (i)     openly promotes the existence of its Silicon Valley office located at 300 Sand Hill Rd., 2-240 Menlo Park, CA 94025 to establish credibility and cache in the technology marketplace;  (*See* Exhibit "A.")

                (ii)     caused RUSNANO USA to be qualified as a California corporation;

                (iii)     appointed a California-based registered agent for service of process, to

wit: Corporation Service Company located at 2810 Gateway Oaks Dr. Suite 150N, Sacramento, CA 95833;

(iv) made substantial direct financial investments into companies located in California including, without limitation, (A) a $39.8 million investment in **NeoPhotonics Corp.**, a public company traded on the New York Stock Exchange with a principal place of business at 2911 Zanker Road, San Jose, CA 95134; (B) a $40 million co-investment (with a California-based venture capital firm) into **CoDA Therapeutics, Inc.** a biopharmaceutical company located at 12520 High Bluff Drive, Suite 350, San Diego, CA 92130; (C) a $40 million investment in **Quantenna Communications, Inc.**, a semiconductor company headquartered at 3450 W. Warren Avenue, Fremont, CA 94538; (D) a substantial investment in **Advenira Enterprises, Inc.**, a nanotechnology company with headquarters at 788 Palomar Ave, Sunnyvale, CA 94085; (E) a substantial investment in **Aquantia Corp.**, a semiconductor company with headquarters at 700 Trasman Drive, Milpitas, CA 95035; (F) a substantial investment in **Compass-EOS**, a semiconductor company with headquarters at 698 Trasman Drive, Milpitas, CA 95035; (G) a substantial investment in **SiTime Corp.**, a semiconductor company with headquarters at 990 Almanor Avenue, Sunnyvale, CA 94085; (G) a substantial investment in **Crocus Technologies, Inc.,** a developer of computer memory products and applications with headquarters at 2380 Walsh Ave. Santa Clara, CA 95051; and (H) a $760 million co-investment / partnership between RUSNANO and Domain Associates, a company that maintains its West Coast headquarters at 12481 High Bluff Drive, Suite 150, San Diego, CA 92130 to establish NovaMedica, a new pharmaceutical company;

(v) routinely invested (and invests) capital into U.S. projects as set forth in a publication dated October 5, 2011 and entitled: RUSNANO: STATUS AND PROSPECTS OF CO-OPERATION WITH AMERICAN PARTNERS, which identifies at least fifteen US-Russia RUSNANO projects with a combined budget of $3.6 billion and which encourages American companies to apply for Russian-source financing at www.RUSNANO.com (the "RUSNANO Website"). (*See* Exhibit "B.")

(vi) has, as of 2011, received 102 requests from U.S.-based companies for

financing and having invested in excess of $3 billion into U.S. companies[2] and, in its capacity as an investor, exercises substantial control over the affairs of the investment recipients including, in addition to the entities listed above, **BiOpExhibit tix Diagnostics, Inc.,** a Delaware company with a principal place of business at 1775 38th Street, Boulder, CO 80301, **Panacela Labs, Inc.,** a Delaware company with a principal place of business at 73 High Street, Buffalo, NY 14203, and **Burrill Capital Fund IV, L.P.,** a hedge fund organized by **Burrill & Co, Inc.,** a San Francisco financial firm specializing in biotechnology and life sciences investments as well as other companies identified in a RUSNANO publication dated September 5, 2012 entitled:   RUSSIAN INNOVATIVE ECONOMY:   IS IT REAL?; (*See* Exhibit "C.")

(vii)    has ongoing commercial relationships with U.S. companies that supply products and services to the RUSNANO Group;  (*See* Exhibit "D.")

(viii)    routinely and on an ongoing basis, solicits capital from qualified and non-qualified U.S.-based investors for its U.S. and foreign projects;

(ix)    at all times relevant hereto, RUSNANO USA was dominated and controlled by RUSNANO to the extent that it had no independent existence;

(x)    the affairs and financial dealings of RUSNANO USA were, and continue to be, so intertwined with those of RUSNANO that there failed to be a recognizable separate existence between them such that RUSNANO USA's assets and liabilities are completely inseparable from those of RUSNANO;

(xi)    upon information belief, RUSNANO and RUSNANO USA have failed and continue to fail to maintain the formalities required to recognize them as separate legal entities, such that RUSNANO USA's funds have been and continue to intermingled with those of RUSNANO, and such that RUSNANO USA is no more than a titular subsidiary of RUSNANO;

(xii)    upon information and belief, RUSNANO and RUSNANO USA have such substantial identity that the United States government, through the Federal Bureau of Investiga-

---

[2] By way of example, and without limitation, the RUSNANO Group owns approximately 9.3% of the issued and outstanding stock of BIND Therapeutics, Inc. [NASDAQ: BIND] an investment presently valued at approximately $22 million.

tions, has cautioned United States technology companies from accepting investments from RUSNANO USA or from providing any technology or trade secrets with RUSNANO USA under the informed belief that RUSNANO USA is no more than a front utilized by the government of the Russian Federation to unlawfully misappropriate American technology and trade secrets for Russian purposes;

(xiii)    in addition, and as pleaded more fully herein, the principal executives, directors, and officers of RUSNANO, each of whom controlled and directed the actions of the RUSNANO Group, as detailed herein, also control and direct the actions and day to day operations of RUSNANO USA;

(xiv)    accordingly, RUSNANO and RUSNANO USA have misused the corporate form, disregarded corporate formalities, and have blurred any distinction *inter se*, to a degree where the distinction between RUSNANO and RUSNANO USA has been rendered meaningless, thereby rendering RUSNANO USA a sham unworthy of the protections provided by the corporate form and as an alter ego of RUSNANO; and

(xv)    in addition, upon information and belief, RUSNANO, as an arm of the government of the Russian Federation, exercises similar domination and control over RMC, RCA, RCL and FRC, each of which are nominal subsidiaries that are wholly controlled by RUSNANO, have no separate corporate identities, have misused the corporate form, and have commingled operations and assets such that they are each alter egos of RUSNANO and, by extension, each other, as well as RUSNANO USA.

(b)    Defendant **Chubais** is the Chairman of the Executive Board of RUSNANO and is responsible for its overall investment strategy.  In that capacity (and in his personal capacity) Defendant Chubais regularly conducts RUSNANO-related business in the United States and has ongoing, purposeful and meaningful contacts with the United States in general and with this federal judicial district in particular;

(c)    Defendants **Kiselev and Rappaport,** upon information and belief, have regular and ongoing contacts with the United States and, in particular, with the district in which this lawsuit is brought;

1         (d)     Defendant **Polikarpov** is a graduate of the Harvard Business School and holds

2 a Masters in Business Administration. He presently serves as a board member (and, upon infor-

3 mation and belief, is a shareholder of) **Aquantia Cor.** (California), **Unicom Global** (California),

4 **NeoPhotonics Corp**. (California), **SiTime Corporation** (California) and **Plug Power, Inc.**

5 [NASDAQ: PLUG], a public company traded on the NASDAQ exchange with a principal place of

6 business in Latham, New York. It is alleged, upon information and belief, that Defendant Polikar-

7 pov has regular, systematic and ongoing personal and business contacts with the State of California;

8         (e)     **Defendant Rostokin** is a Russian-trained lawyer who was appointed Chief

9 Executive Officer and Member of the Board of Directors of Nitol Solar in or around July, 2009; and

10         (f)     Nominal Defendant **Nitol Solar** is one of Russia's largest producers of Pol-

11 ysilicon, a specialty chemical used in the production of solar panels. As set forth more fully below,

12 Nitol Solar actively sought capital from U.S. sources and met with prospective and actual investors

13 in the State of California. Furthermore, at all times relevant hereto, Nitol Solar is a party to long-

14 term polysilicon supply contracts with U.S.-based customers. (*See* Exhibit "E.")

15     40.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) in that a sub-

16 stantial part of the events or omissions giving rise to the claims herein occurred in this District, a

17 substantial part of the property that is the subject of the action is situated in this District, and De-

18 fendants have sufficient contacts with this Federal Judicial District such that Defendants may be

19 found here.

20 **OPERATIVE FACTS.**

21 **A.**     <u>Poly-Si</u>

22     41.     Polycrystalline silicon, also called polysilicon or poly-Si, is a high purity, multicrys-

23 talline form of silicon, used as a raw material by the solar photovoltaic ("<u>PV</u>") and electronics indus-

24 try.

25     42.     Poly-Si exhibits semiconductor like properties and is thereby used as a feedstock ma-

26 terial in solar energy applications. Depending on the technology used for production, polysilicon is

27 manufactured in two forms: Chunk polysilicon and granular polysilicon. Utilizing the Czochralski

28 crystal growth process, one can convert polysilicon chunks into high-quality silicon ingots, which

can then be sliced into high-grade silicon wafers. These silicon wafers have a wide variety of applications in integrated circuits.

43.     Two major markets for polysilicon include solar industry and semiconductor industry. In semiconductor applications polysilicon is changed to single crystalline silicon to become electric component such as integrated circuits that forms the main component for electronic devices. Mono or multi crystalline silicon as substrates are used in making power cells with polysilicon as the main component.

44.     The global market for poly-Si is approximately $15 billion per year.  Russia is a significant producer or PV-quality poly-Si.  Tretyakov has more than thirty (30) years' experience in the poly-Si industry, formerly served as the Director of the Silicon Program for the Russian Federal Agency for Atomic Energy ("Rosatom") and, at all times relevant hereto, was one of the principal architects of Russia's poly-Si program.

**B.     The Nitol Plant**

45.     At all times relevant hereto, Nitol Solar operated a polysilicon production plant (the "Nitol Plant") in the Irkutsk Region of the Russian Federation.

46.     Prior to 2004, the Nitol Plant had been an adjunct of a larger, nearly defunct Soviet-era chemical plant that fell into disrepair.  However, a small unit at the plant produced a chemical called trichlorosilane which is a key ingredient in polysilicon for solar panels.

47.     In or around 2004, a group of scientist-investors including Plaintiff Neas, recognized an opportunity to commercialize the Nitol Plant and transform it into a major supplier of raw materials used in the photovoltaic industry.

48.     To that end, between 2005 and 2008, the initial founders of the Nitol Plant, including Neas, collectively invested $300 million (the "Initial Investment") into the acquisition, development and commercialization of the Nitol Plant.  Ownership of the Nitol Plant was vested with nominal defendant Nitol Solar.

49.     During this time period, Nitol Solar constructed the Nitol Plant,[3] commissioned a

---

[3] Upon information and belief, construction of the Nitol Plant was managed by the Fluor Corporation, headquartered at 6700 Las Colinas Blvd. Irving, TX.

processing chain for the commercial scale polysilicon production, developed all elements of its material technical and infrastructure base, developed expertise in engineering support and production processes, perfected quality control over feedstock and trained personnel in production processes.

50.     Neas' proportion share of the Initial Investment was twenty-six percent (26%).

51.     As a result, by mid-2008, the Nitol Plant emerged as Russia's preeminent producer of polycrystalline silicon for use in the photovoltaic industry.  With projected production capacity of 5,000 tons per year, Nitol Solar successfully marketed the plant to prospective purchasers of Poly-SI throughout the world including, without limitation, companies in the United States and/or companies such as Trina Solar Limited which, while foreign, are traded on the New York Stock Exchange [NYSE: TSL].

52.     At least one such company, Boston-based Evergreen Solar, Inc. ("ESI"), placed multi-year firm orders for Poly-Si produced by the Nitol Plant.

53.     In addition, Nitol's success attracted substantial foreign investment including, without limitation, a $75 million equity/debt infusion made on or about July 31, 2008 by International Finance Corporation ("IFC") the financial arm of the World Bank and a $100 million equity/debt package made available in August 2008 by PV industry mega-player Suntech Power Holdings Co. Ltd. ("Suntech") [NYSE: STP].

**C.     The RUSNANO Investment**

54.     Beginning in or around 2009, Nitol Solar sought additional capital from investors to further modernize and expand production at the Nitol Plant.  Its search for capital was global and included, without limitation, sources of funding located in California's Silicon Valley.

55.     At or around the same time, RUSNANO (which was operated and controlled by Defendant Chubais, one of the pre-eminent Russian oligarchs) had also developed an interest in the production of crystalline polysilicon.

56.     Through a joint venture with the Renova Group ("Renova"), a Russian industrial conglomerate operated and controlled by Defendant Vekselberg (another preeminent Russian oligarch), RUSNANO and Renova sought to acquire and control thin film, vacuum and solar technologies used in the photovoltaic industries.

-13-

57.     Through participation in solar industry conferences including, without limitation, conferences that took place in Russia as well as New York, Denver, Washington, D.C. and California in or around 2008, the founders of the Nitol Plant (including Neas) were introduced by or to RUSNANO representatives and its U.S. representatives.

58.     RUSNANO expressed support for the expansion of the Nitol Plant's production capacity as ostensibly; it required a steady and reliable supply of Poly-Si, a key raw material in its other solar-facing acquisition with Renova.  Moreover, Nitol's already existing supply contracts with U.S.-based companies comported with RUSNANO's objective to establish a stronger presence in the United States.  In reality, however, RUSNANO saw the opportunity to acquire Russia's leading (and only) reliable producer of Poly-Si and thus establish (through a forced takeover) a vertically integrated solar conglomerate.

59.     RUSNANO further extended to Nitol Solar and its then-existing shareholders an offer that they could not refuse – i.e. that RUSNANO, as a government lender, would provide the enterprise with invaluable and indispensable legal and political cover, a concept known as *krysha* or literally, "roof".  At the time, Dimitriy Mezentsev the Governor of the Irkutsk region of Russia, the region in which the Nitol Plant was located, was a member of RUSNANO' supervisory board.

60.     Neas agreed to accept funding from RUSNANO for the modernization and further commercialization of the Nitol Plant. To that end in or around March 11, 2009, Nitol Solar entered into two revolving credit facilities, the RUSNANO Credit with RUSNANO for approximately RUB 4.5 billion and the Alpha Credit with Alpha for approximately RUB 7.5 billion.

61.     As part of the modernization, the following organizational structure was adopted and implemented with respect to the Nitol Plant:

(a)     The Nitol Plant was operated by OOO[4] Usolye-Sibirsky Silicon ("USS"), a Russian limited liability company;

(b)     USS was 99.99% owned by OOO Nitol Group ("NG"), a Russian limited lia-

---

[4] The Russian term "OOO" is synonymous with the U.S. term "LLC".  The letters OOO stand for <u>O</u>bshchestvo s <u>O</u>granichennoy <u>O</u>tvetstvennostyu, the Russian equivalent of a Limited Liability Company.

bility company;

(c)     NG was 99.99% owned by INSQU Production, Ltd. ("INSQU"), a closely held Cyprus company; and

(d)     INSQU was 100% owned by Nitol Solar, a public Jersey company.

62.     The RUSNANO Group and the Nitol Insiders used this structure to accumulate profits from commercialized activities of the Nitol Plant in offshore jurisdiction thus shielding them from taxes and circumventing repatriation obligation imposed under Russian law.[5]

63.     Neas' 26% stake in the Nitol Plant was converted and/or transformed into 4,703,125 shares of common stock in Nitol Solar.

64.     As of September 30, 2009, Nitol Solar's 100% interest in INSQU had a fair market value of RUB 10,785,000,000 which, at then-prevailing exchange rates, equaled USD $359,500,000.

65.     In consideration for the credit facilities, Nitol Solar was required to pledge its right, title and interest in INSQU to RUSNANO as collateral.  Furthermore, although Alpha Credit had extended the larger of the two credit facilities, pursuant to an inter-creditor arrangement RUSNANO assumed the role of lead lender.

**D.     RUSNANO Takes Control**

66.     Using its powers as the lead lender, effective March 2009, RUSNANO appointed Defendant Polikarpov as a Nitol director.

67.     Instead of running Nitol Solar and the Nitol Plant in a manner designed to maximize shareholder value, Polikarpov grossly mismanaged Nitol's affairs, diverted valuable corporate assets and usurped for valuable corporate opportunities with RUSNANO's knowledge and approval, while drawing exorbitant compensation and benefits funded largely by the aforementioned credit facilities.

68.     Using public funds and a series of offshore owned and/or controlled by the RUSNANO Group, Polikarpov caused Nitol to either enter into economically disadvantageous transactions and/or or utilize RUSNANO-controlled middlemen to purchase and sell goods and ser-

---

[5] In fact, in August of 2014, the Office of the Prosecutor General launched a corruption investigation into the RUSNANO Group which, upon information and belief, led to the criminal charges against the financial director and several board members of RUSNANO for misappropriation of funds and abuse of power.  (*See* Exhibit "F.")

vices.

69.     Through a classic tolling scheme, the profits associated with these transactions accumulated offshore and distributed and dispersed among innumerable offshore affiliates through paper transactions that lacked any economic substance.

**E.     Nitol Capital Shortage**

70.     By 2010, Nitol Solar required additional funding, a need created in part by (i) the malfeasance of Polikarpov and those affiliated with him as set forth above and (ii) interest that had accrued on the RUSNANO credit which, at the time, was close to RUB 200,000,000 (USD $6.6 mil at then-prevailing exchange rates).

71.     During this time period, Polikarpov, who was both a RUSNANO representative and simultaneously a Nitol Solar board member, assured the Nitol Solar board and its shareholders, including Neas, that RUSNANO would provide additional funding and/or financing.

72.     These assurances were reaffirmed to Neas' principal, Dr. Andrew Tretyakov, a resident of Stamford, CT, discussed the future prospects of the Nitol Plant with RUSNANO's U.S. and Russian representatives at solar and photovoltaic industry conferences in, *inter alia*, the United States in 2010.

73.     In or around January 24, 2011, Polikarpov informed the Nitol Solar board that he had reached a tentative agreement with RUSNANO that (i) RUSNANO would invest (as opposed to merely lend) the sum of RUB 2 billion into Nitol in exchange for stock; and (ii) that the obligation to pay accrued interest on the RUSNANO Credit would be deferred and addressed following the investment.

74.     Between January 2011 and April 2011, Nitol Solar engaged in what it believed to be good faith negotiations with RUSNANO over the terms of a RUB 2 billion investment.  These negotiations were carried out by Defendant Polikarpov, a Nitol board member whose duties of loyalties ran in favor of Nitol and its shareholders.

75.     In or around April 19, 2011, RUSNANO circulated proposed terms of investment. Under the proposed terms, RUSNANO reserved for itself (i) privileged right to appoint board members; (ii) priority over all stockholders in the event of a Nitol Solar initial public offering which, at

the time, was planned on the London Stock Exchange; (iii) the right to veto any increase in Nitol's authorized share capital; and (iv) the right to appoint an arbitrator to resolve all investment-related disputes (i.e. a dispute resolution clause where in the event of disputes RUSNANO and only RUSNANO selected the judge).

76.     These terms were not acceptable and questions arose whether such terms were even legally enforceable.  As a result, Nitol and RUSNANO agreed to continue negotiations over the terms of the proposed investment and thus postpone the issue of the deferred interest for a period of at least three (3) months.

**F.     RUSNANO's Hold Intensifies**

77.     In June 2011, through influence exerted by RUSNANO, Nitol's then-CEO Dmitri Kotenko ("Kotenko") was replaced by Valery Rostokin ("Rostokin"), another Nitol Insider.  Kotenko, one of the original founders of the Nitol Plant was a graduate of the London School of Economics and an experienced manager.  Rostokin is a Russian-trained attorney.  Upon information and belief, although Rostokin was appointed as CEO of Nitol, his loyalties ran in favor of RUSNANO, Nitol's creditor and counterparty.

78.     Thus, as of July, 2011, RUSNANO effectively controlled (i) Nitol's CEO and (ii) the board member charged with negotiating the Nitol-RUSNANO investment.

79.     In or around August 12, 2011, Rostokin falsely informed the Nitol Board that re-negotiations with RUSNANO over terms more reasonable than those circulated on or around April 19, 2011 had been successful and that documentation confirming the RUSNANO investment had been prepared.  Rostokin's sentiment was reaffirmed and reinforced by Polikarpov.

80.     On or about August 16, 2011, RUSNANO circulated a document indicating that the interest on the RUSNANO Credit would be deferred until July 25, 2012 at which point, the deferred interest would be repaid based on a twelve month amortization, *i.e.*, by approximately July 25, 2013.

81.     During the negotiations, Nitol Solar, out of an abundance of caution, sought bridge financing from, *inter alia*, Sberbank of Russia ("Sber") and the Eurasian Development Bank ("EDB").  As of September 13, 2011, Sber had agreed to provide Nitol Solar with bridge financing in an amount sufficient to pay the interest that had accrued on the RUSNANO Credit in full.  This

opportunity was brought to the attention of Defendant Rostokin as a possible alternative. Rostokin purposefully rejected and decided not to pursue any further bridge financing. Instead, he led the Nitol board and its shareholders to believe that the RUSNANO investment was imminent.

**G.** **The RUSNANO Takeover**

82. On September 15, 2011, Rostokin circulated a letter to all lenders requesting a deferral of all interest through 2014 based on the imminently anticipated RUSNANO investment.

83. On September 22, 2011, Rostokin informed Nitol Plant managers that a routine valuation of the Nitol Plant was being carried out by RUSNANO and directed them to provide RUSNANO with whatever documentation was requested. In fact, no such routine valuation had taken place and in reality, the information was provided as part of the illegal takeover. Rostokin did not inform the Nitol Board or its shareholders of the request for materials made by RUSNANO. He further concealed communications between RUSNANO from the other Nitol board members and its shareholders.

84. On or around September 25, 2011, Rostokin arranged to have a letter drafted to all Nitol directors announcing that Nitol was in technical default on the obligation to pay interest on the RUSNANO Credit effective September 26, 2011 and that a waiver of rights had been requested but had not yet been executed. However, Rostokin did not circulate or deliver the letter to anyone under the guise that he was waiting for the outcome of ongoing and important RUSNANO-related meetings.

85. On September 26, 2011, on the default date that was going to be communicated in a draft letter that was never sent, Rostokin suddenly flew to Irkutsk, Russia to deal with "issues" at the Nitol plant. In fact, upon information and belief, there were no issues that required the direct involvement of the parent company's CEO and Rostokin purposefully made himself unavailable at the most critical moment in time.

86. In the meantime, on September 26, 2011, a meeting took place with RUSNANO, which meeting was chaired by Defendant Polikarpov, who was acting in the capacity as representative of RUSNANO, the lender and putative investor, despite the fact that he was a Nitol board member. Polikarpov asked routine questions regarding Nitol's future prospects and did not, at any point

during this meeting, intimate that a default was imminent or that the investment had been cancelled.

87.     To the contrary, Mr. Polikarpov, *qua* RUSNANO representative, assured Nitol Solar that funding was imminently forthcoming.  Nitol Solar reasonably relied upon those assurances, given that they were coming from its own board member.

88.     However, instead of procuring and/or providing the promised credit infusion, on September 26, 2011 RUSNANO suddenly and unexpectedly declared a default on the RUSNANO Credit based on Nitol's supposed failure to pay accrued interest.  Immediately following the declaration of default, RUSNANO – using "powers" supposedly arising under the Pledge Agreement – effectuated a private extrajudicial foreclosure on the shares of INSQU, Nitol's principal operating company, which had been pledged as collateral for the RUSNANO Credit.  A true and correct copy of the takeover notice dated September 30, 2011 (the "Takeover Notice") is attached herewith as Exhibit "G".

89.     RUSNANO then transferred INSQU's shares to Sherigo, which supplanted Nitol's existing shareholders, including, Neas, and extinguished all shareholder value.

90.     RUSNANO then "offered" Neas and other minority shareholders – including Suntech who is located in California – the opportunity to acquire an equity stake in Sherigo conditioned on a combined investment of an additional RUB 5.2 million (the equivalent of $121 million).  The RUSNANO offer was extended by A.B. Malyshev ("Malyshev"), the Deputy CEO of RUSNANO. The offer recipients, Neas included, were invited to accept the offer by giving notice to Defendant Polikarpov by email at Sergey.Polikarpov@RUSNANO.com.

91.     Remarkably, although the pre-takeover restructuring negotiations dragged on for a period of nine months, shortly after the takeover, the RUSNANO Credit was promptly restructured through a lending syndicate that included Sber, Sberbank Capital, LLC ("SCL") and the EDB.

92.     Thus, on the pretext that Nitol Solar failed to pay accrued interest of approximately $6 million dollars, which could have been easily paid from any number of sources that were ready and willing to advance funds, due acts of malfeasance and dissemblance carried out by disloyal insiders, RUSNANO acquired full control of a company then-valued at over $300 million dollars, all at the expense of legitimate shareholders like Neas.

**H.     The Russian Criminal Investigation.**

93.     In 2013, the Accounts Chamber of the Russian Federation (the "ACRF"), a Russian government body responsible for audits and financial controls relative to government projects, conducted an audit of RUSNANO's activities.

94.     The audit uncovered significant (and previously undisclosed) financial irregularities rising to the level of tax evasion, abuse of office, money laundering, embezzlement, fraudulent bankruptcy filings and other acts of malfeasance.  The English translation of the ACRF report dated May 16, 2013 is attached herewith as Exhibit "H" and the original Russian-language text is attached as Exhibit "I".

95.     Specifically, with respect to RUSNANO's participation in the Nitol Plant investment, the ACRF determined that RUSNANO officials (i) caused Nitol Plant to pay tens of millions of dollars in orders to companies that existed purely on paper and that had anywhere from zero to two employees; (ii) entered into transactions that lacked economic substance and were a sham designed to conceal underlying malfeasance; (iii) engaged in activities resembling money laundering; (iv) diverted funds earmarked for the modernization of the Nitol Plant through a complex shell of offshore companies and into various offshore bank accounts; and (iv) engaged in tax evasion.

96.     As a result, the financial director and several board members of RUSNANO have been criminally charged with misappropriation of funds and abuse of power and said charges are presently pending in the Russian Federation.  (*See* Exhibit "F.")

97.     Upon information and belief, the appropriation of private equity interests in Nitol Solar by action of a Russian state-owned corporation occurred as a result of directives personally given by the RUSNANO Control Persons.

98.     During a Russian press conference held on April 29, 2013, Defendant Chubais acknowledged that RUSNANO purposefully decided to "remove" Nitol Solar's shareholders from the project after determining that their further participation and/or involvement was no longer aligned with RUSNANO's interests.

///

///

**FIRST CLAIM FOR RELIEF**
**PLAINTIFFS v. DEFENDANTS**
**CIVIL RICO**

99.     Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if set forth at length herein.

100.     Each of the Defendants is a person within the meaning of 18 U.S.C. § 1961.

101.     Each of the defendants has engaged in illegal activity to further the unlawful acts complained of herein by, *inter alia*, defrauding Plaintiffs of their right, title to, and interest in Nitol.

102.     Defendants constitute an enterprise within the meaning of 18 U.S.C. § 1961.

103.     Defendants have engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961 in that Defendants have engaged in acts of mail fraud, wire fraud, international money laundering and other predicate acts utilizing the wires and infrastructure of the United States of America to perpetuate the fraudulent or otherwise unlawful acts complained of while in the territories of the United States as described *supra*, and have made use of other instrumentalities of interstate and foreign commerce to perpetrate their fraud upon Plaintiffs.

104.     The pattern of racketeering consisted of, *inter alia*, (i) the extension of credit to a promising company by a financial institution or institutions primarily owned and controlled by the Government of the Russian Federation; (ii) installing insiders within the company under the guise of protecting the lender's interests when, in fact, the real mission was to seize control over the company's affairs; (iii) securing control over the company's affairs during which time the company's resources and assets were diverted to offshore outlets beneficially owned by the lender and/or its control persons; (iv) engaging in self-dealing thus stripping the company of value; (v) purposefully and fraudulently causing and inducing the company to default on its credit facility while promising forbearance; (vi) instead of forbearing, using powers under the loan agreements to seize 100% of the company and eradicate and expropriate all private shareholder value; (vii) transfer 100% of the assets to another entity wholly owned and controlled by the Russian Government thus completing the fraudulent takeover; (viii) using U.S. entities (and establishing U.S. bank accounts) to siphon and hide profits associated with the illegal activities; (ix) then re-investing profits realized from the illegal takeover  into U.S. companies for purpose of commercial espionage.

105.   As a direct and proximate result of those unlawful acts, Plaintiffs have suffered an injury in fact and damages within the United States of America.

WHEREFORE, Plaintiffs, Neas Limited and Andrey Tretyakov, demand judgment in their favor and against Defendants, OJSC RUSNANO, RUSNANO Management Company, LLC, RUSNANO Capital, A.G., RUSNANO Capital, LLC, and RUSNANO USA, Inc., in an amount in excess of $75,000, plus costs, attorneys' fees, and any other relief that this Court deems necessary, just, and appropriate.

### SECOND CLAIM FOR RELIEF
### PLAINTIFFS v. THE RUSNANO GROUP
### BREACH OF CONTRACT – DISPOSAL OF COLLATERAL

106.   Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if set forth at length herein.

107.   RUSNANO and Nitol Solar entered into a valid, binding agreement, whereby RUSNANO agreed to extend a RUB 4.5 billion revolving line of credit for the purpose of, *inter alia*, modernizing the Nitol Plant.

108.   Pursuant to the parties' agreements, the Nitol Plant was operated by USS, which in turn was owned by NG and INSQU, which, in turn, was owned by Nitol Solar.

109.   Pursuant to the parties' agreements, RUSNANO inserted certain board members, including Polikarpov, onto the Nitol Solar board of directors.

110.   Pursuant to the parties' agreements, as partial consideration for extension of the revolving credit facility, the shares of INSQU were pledged as collateral.

111.   RUSNANO intentionally caused Polikarpov to cause Nitol Solar and, by extension, INSQU to technically default on its obligations under the credit agreement as aforesaid.

112.   When that default occurred, RUSNANO declared Nitol Solar in breach of its agreement with RUSNANO, seized the shares of INSQU held as collateral through extrajudicial self-help, and disposed of the shares by transferring them to Sherigo.

113.   By causing Nitol Solar to default on its obligations, by misleading Neas and other Nitol Solar investors, by unlawfully seizing the shares of INSQU, and by transferring ownership of the INSQU shares to Sherigo, RUSNANO breached its contract with Nitol Solar, and breached, without

1   limitation, the covenant of good faith and fair dealing.

2   114.   At all times relevant hereto, Chubais was an active participant in and personally di-

3   rected the RUSNANO Group's actions.

4   115.   As a result of those breaches, Plaintiffs have suffered damages, including, without

5   limitation, the value of its investment in Nitol Solar.

6   WHEREFORE, Plaintiffs, Neas Limited and Andrey Tretyakov, demand judgment in their

7   favor and against Defendants, OJSC RUSNANO, RUSNANO Management Company, LLC,

8   RUSNANO Capital, A.G., RUSNANO Capital, LLC, and RUSNANO USA, Inc., in an amount in

9   excess of $75,000, plus costs, attorneys' fees, and any other relief that this Court deems necessary,

10  just, and appropriate.

11  ### THIRD CLAIM FOR RELIEF
    ### PLAINTIFFS v. THE RUSNANO GROUP, THE RUSNANO CONTROL PERSONS
12  ### BAD FAITH DISPOSAL OF COLLATERAL

13  116.   Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if

14  set forth at length herein.

15  117.   At all times relevant hereto, the RUSNANO Group, as borrower, exercised dominion

16  and control over the affairs of Nitol Solar to a degree sufficient to create a fiduciary relationship.

17  118.   By reason of the aforesaid, and through the abuse of its powers as a lender and fiduci-

18  ary, the RUSNANO Group disposed of the collateral in bad faith.

19  119.   The RUSNANO Control Persons, as active participants who directed and controlled

20  the actions of the RUSNANO Group, directly and personally participated in the bad faith disposal of

21  collateral.

22  120.   By reason of the aforesaid, Plaintiff has suffered damages, including, without limita-

23  tion, the value of its investment in Nitol Solar.

24  WHEREFORE, Plaintiffs, Neas Limited and Andrey Tretyakov, demand judgment in their

25  favor and against Defendants, OJSC RUSNANO, RUSNANO Management Company, LLC,

26  RUSNANO Capital, A.G., RUSNANO Capital, LLC, RUSNANO USA, Inc., Anatoly Chubais,

27  Oleg Kiselev and Irina Rappaport, in an amount in excess of $75,000, plus costs, attorneys' fees, and

28  any other relief that this Court deems necessary, just, and appropriate.

**FOURTH CLAIM FOR RELIEF**
**PLAINTIFFS v. THE RUSNANO GROUP, THE RUSNANO CONTROL PERSONS**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

121.    Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if set forth at length herein.

122.    As set forth above, a valid, binding agreement existed between the RUSNANO Group and Plaintiff and Nitol Solar.

123.    The RUSNANO Group violated the covenant of good faith and fair dealing inherent in that agreement by, *inter alia*, coercing Nitol Solar into default, misrepresenting material facts, promising additional investments, inducing Nitol Solar to forego seeking additional financing, and disposing of the collateral on commercially unreasonable terms.

124.    The RUSNANO Control Persons, as active participants who directed and controlled the actions of the RUSNANO Group, directly and personally participated in the bad faith disposal of collateral.

125.    By reason of the aforesaid, Plaintiff has suffered damages, including, without limitation, the value of its investment in Nitol Solar.

WHEREFORE, Plaintiffs, Neas Limited and Andrey Tretyakov, demand judgment in their favor and against Defendants, OJSC RUSNANO, RUSNANO Management Company, LLC, RUSNANO Capital, A.G., RUSNANO Capital, LLC, RUSNANO USA, Inc., Anatoly Chubais, Oleg Kiselev and Irina Rappaport in an amount in excess of $75,000, plus costs, attorneys' fees, and any other relief that this Court deems necessary, just, and appropriate.

**FIFTH CLAIM FOR RELIEF**
**PLAINTIFFS v. THE RUSNANO GROUP**
**EQUITABLE ESTOPPEL**

126.    Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if set forth at length herein.

127.    The RUSNANO Group promised to invest RUB 2 billion and to defer interest on the RUSNANO Credit.

128.    Plaintiff, Nitol Solar, and Nitol Solar's other investors justifiably relied on that promise and on other representations made by the RUSNANO Group and on behalf of the RUSNANO

Group by the RUSNANO Insiders to their detriment.

129. As a result of that reliance, Plaintiff, Nitol Solar, and Nitol Solar's other investors have suffered damage.

130. The RUSNANO Group should be estopped from reneging on those promises and from, *inter alia*, disposing of the INSQU share collateral and seizing control of Nitol Solar in the manner alleged.

WHEREFORE, Plaintiffs, Neas Limited and , demands judgment in its favor and against Defendants, OJSC RUSNANO, RUSNANO Management Company, LLC, RUSNANO Capital, A.G., RUSNANO Capital, LLC, and RUSNANO USA, Inc., in an amount in excess of $75,000, plus costs, attorneys' fees, and any other relief that this Court deems necessary, just, and appropriate.

**SIXTH CLAIM FOR RELIEF**
**PLAINTIFF, NEAS LIMITED, individually and derivatively**
**on behalf of NITOL SOLAR v. POLIKARPOV**
**VIOLATION OF SECTION 74 OF THE COMPANIES ACT OF 1991 OF JERSEY**

131. Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if set forth at length herein.

132. Under the Companies Act of 1991 of Jersey, as a director of Nitol Solar, Polikarpov owed Nitol Solar and its owners the duties to act honestly and in good faith with a view to the best interests of the company, and to exercise the care, diligence and skill that a reasonably prudent person would exercise under the circumstances.

133. By reason of the aforesaid, Polikarpov breached those duties to Nitol Solar and its owners by acting dishonestly, acting in bad faith, acting with a view of his own best interests and the best interests of the RUSNANO Group, and by failing to exercise reasonable care, diligence and skill that a reasonably prudent person would exercise under the circumstances.

134. As a result of Polikarpov's breaches, Nitol Solar and its owners, including Plaintiff, suffered substantial damages.

135. Polikarpov's breaches of the duties of loyalty and care as embodied in the Jersey Companies Act of 1991 were so willful, wanton, reckless, and intentional as to justify an award of punitive damages.

WHEREFORE, Plaintiff, Neas Limited, demands judgment in its favor and against Defendant, Sergei Polikarpov, in an amount in excess of $75,000, plus punitive damages, costs, attorneys' fees, and any other relief that this Court deems necessary, just, and appropriate.

### SEVENTH CLAIM FOR RELIEF
### PLAINTIFF, individually and derivatively on behalf of NITOL SOLAR
### v. POLIKARPOV. THE RUSNANO GROUP AND SHERIGO
### VIOLATION OF SECTION 75 OF THE COMPANIES ACT OF 1991 OF JERSEY

136. Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if set forth at length herein.

137. Under Section 75 of the Jersey Companies Act of 1991, Polikarpov was required to disclose that he had a personal interest in the transactions entered into with the RUSNANO Group by Nitol Solar between 2009 and 2011, including Nitol Solar's loan relationship with the RUSNANO Group, which ended when Polikarpov intentionally caused Nitol Solar to default on its obligations.

138. Polikarpov failed to disclose that he had a financial interest, direct or indirect, in those transactions in violation of Jersey law.

139. Pursuant to Section 76 of the Jersey Companies Act of 1991, this Court has the power to undue and to unwind the financial transactions between Nitol Solar and the RUSNANO Group, including the RUSNANO Group's seizure of the INSQU shares and disposal of the INSQU shares to Sherigo because Polikarpov failed to disclose his interest in those transactions.

140. The aforesaid transactions were not confirmed by special resolution.

141. Sherigo did not act in good faith and was, upon information and belief, a company created by or on behalf of the RUSNANO Group specifically for the purpose of seizing the Nitol Solar shares in violation of Jersey law.

WHEREFORE, Plaintiff, Neas Limited, individually on its own behalf and derivatively on behalf of Nitol Solar Limited, demands judgment in its favor against Defendants, Sergei Polikarpov, OJSC RUSNANO, RUSNANO Management Company, LLC, RUSNANO Capital, A.G., RUSNANO Capital, LLC, RUSNANO USA, Inc., and Sherigo Resources Limited, in an amount in excess of $75,000, plus costs and attorneys' fees, and an order setting aside the RUSNANO Group's seizure of the INSQU shares and disposing of those shares by transferring them to Sherigo Re-

sources Limited, along with whatever other relief this Court deems necessary, just, and appropriate.

**EIGHTH CLAIM FOR RELIEF**
**PLAINTIFF, NEAS LIMITED, individually and derivatively**
**on behalf of NITOL SOLAR v. ALL DEFENDANTS**
**VIOLATION OF SECTION 141 OF THE COMPANIES ACT OF 1991 OF JERSEY**

142.   Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if set forth at length herein.

143.   Section 141 of the Jersey Companies Act empowers a shareholder or member of a Jersey company to apply to this court for an Order granting relief where the Jersey company's affairs are being or have been conducted in a manner which is unfairly prejudicial to the rights of its members or to some part of its membership, including Plaintiff.

144.   As a result of the aforesaid, Plaintiff's rights and interest in Nitol Solar have been unfairly prejudiced and, indeed, have been seized, stripped, converted and stolen by the RUSNANO Group and Sherigo without due process of law and in a manner that does not comport with the laws of Jersey.

145.   Accordingly, Plaintiff hereby applies to this Court for an Order awarding it damages in the amount of its lost investment and consequential damages, and setting aside the RUSNANO Group's seizure and disposal of the INSQU shares and Neas' interest in Nitol Solar.

WHEREFORE, Plaintiff, Neas Limited, individually on its own behalf and derivatively on behalf of Nitol Solar Limited, demands judgment in its favor against Defendants, in an amount in excess of $75,000, plus costs and attorneys' fees, and an order setting aside the RUSNANO Group's seizure of the INSQU shares and disposing of those shares by transferring them to Sherigo Resources Limited, along with whatever other relief this Court deems necessary, just, and appropriate.

**NINTH CLAIM FOR RELIEF**
**PLAINTIFF, NEAS LIMITED v. ALL DEFENDANTS**
**ACCOUNTING**

146.   Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if set forth at length herein.

147.   Defendants have failed and refused to give Plaintiff Neas access to the books and records of Nitol Solar and INSQU including, without limitation, access to the books and records related

to Nitol Solar's financial dealings and transactions, including those that benefited Polikarpov or the RUSNANO Group.

148. Defendants owe contractual and fiduciary duties to Plaintiff Neas.

149. Defendants have violated their contractual and fiduciary duties to Plaintiff Neas by failing to provide a full and detailed accounting of Nitol Solar's financial dealings.

150. Plaintiff Neas has been damaged by Defendants' failure and refusal to provide it with an accounting of Nitol Solar's and INSQU's financial dealings described *supra*.

151. Equity demands that Plaintiff Neas be provided an accounting of all of Nitol Solar's and INSQU's financial dealings.

WHEREFORE, Plaintiff, Neas Limited, demands judgment in its favor and against Defendants, including an Order directing Defendants to provide Plaintiff with a complete and full accounting of Nitol Solar Limited's and INSQU Limited's financial dealings and transactions.

**TENTH CLAIM FOR RELIEF**
**PLAINTIFF v. ALL DEFENDANTS**
**CONSTRUCTIVE TRUST**

152. Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if set forth at length herein.

153. The RUSNANO Group's and Sherigo's right, title and interest in Nitol Solar and INSQU were unlawfully seized and disposed of without due process of law and in derogation of Plaintiff Neas' right, title and interest in same, and are subject to a constructive trust and are held in favor of and for the benefit of Plaintiff Neas.

WHEREFORE, Plaintiff, Neas Limited, demands judgment in its favor and against Defendants, including an Order placing Defendants' right, title and interest in Nitol Solar Limited and INSQU Limited into constructive trust for the benefit of Plaintiff.

**ELEVENTH CLAIM FOR RELIEF**
**PLAINTIFFS v. NITOL INSIDERS, THE RUSNANO GROUP,**
**CHUBAIS, KISELEV AND RAPPAPORT**
**FRAUD**

154. Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if set forth at length herein.

155.    By reason of the aforesaid, the Nitol Insiders, the RUSNANO Group and the RUSNANO Control Persons fraudulently induced Plaintiffs and Nitol Solar's other insiders to be-lieve that the RUSNANO Group would invest the sum of RUB 2 billion in Nitol Solar and would defer interest payments on the RUSNANO Credit, and to forego acquisition of additional financing to avoid a technical default on the RUSNANO Credit.

156.    Those misrepresentations and omissions of material fact were made, in part, within the United States.

157.    Defendants made those misrepresentations and omitted those material facts with the knowledge expectation that Plaintiffs would rely upon them.

158.    Plaintiffs justifiably relied upon the Nitol Insiders', the RUSNANO Group's, and the RUSNANO Control Persons' representations, misrepresentations, and omissions of fact.

159.    As a result of that justifiable reliance, Plaintiffs suffered damages.

160.    The Nitol Insiders', the RUSNANO Group's, and the RUSNANO Control Persons' ac-tions were so willful, wanton, reckless, and intentional as to justify an award of punitive damages.

WHEREFORE, Plaintiffs, Neas Limited and Andrey Tretyakov, demands judgment in its fa-vor and against Defendants, OJSC RUSNANO, RUSNANO Management Company, LLC, RUSNANO Capital, A.G., RUSNANO Capital, LLC, RUSNANO USA, Inc., Anatoly Chubais, Oleg Kiselev, Sergei Polikarpov, Irina Rappaport, and Valery Rostokin, in an amount in excess of $75,000, plus costs, and whatever other relief this Court deems necessary just and appropriate.

**TWELFTH CLAIM FOR RELIEF**
**PLAINTIFFS v. NITOL INSIDERS, THE RUSNANO GROUP,**
**CHUBAIS, KISELEV AND RAPPAPORT**
**NEGLIGENT MISREPRESENTATION**

161.    Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if set forth at length herein.

162.    By reason of the aforesaid, the Nitol Insiders, the RUSNANO Group and the RUSNANO Control Persons fraudulently induced Plaintiffs and Nitol Solar's other insiders to be-lieve that the RUSNANO Group would invest the sum of RUB 2 billion in Nitol Solar and would defer interest payments on the RUSNANO Credit, and to forego acquisition of additional financing

to avoid a technical default on the RUSNANO Credit.

163. Those misrepresentations and omissions of material fact were made, in part, within the United States.

164. Defendants made those misrepresentations and omitted those material facts with the knowledge expectation that Plaintiffs would rely upon them.

165. Plaintiffs justifiably relied upon the Nitol Insiders', the RUSNANO Group's and the RUSNANO Control Persons' representations, misrepresentations, and omissions of fact.

166. As a result of that justifiable reliance, Plaintiffs suffered damages.

167. To the extent that those misrepresentations and omissions were not made intentionally, they were made negligently.

WHEREFORE, Plaintiffs, Neas Limited and Andrey Tretyakov, demands judgment in their favor and against Defendants, OJSC RUSNANO, RUSNANO Management Company, LLC, RUSNANO Capital, A.G., RUSNANO Capital, LLC, RUSNANO USA, Inc., Anatoly Chubais, Oleg Kiselev, Sergei Polikarpov, Irina Rappaport, and Valery Rostokin, in an amount in excess of $75,000, plus costs, and whatever other relief this Court deems necessary just and appropriate.

**THIRTEENTH CLAIM FOR RELIEF**
**PLAINTIFF, NEAS LIMITED, individually and on behalf of**
**NITOL SOLAR v. NITOL INSIDERS**
**BREACH OF FIDUCIARY DUTY**

168. Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if set forth at length herein.

169. As directors and officers of Nitol Solar, each of the Nitol Insiders owed fiduciary duties to Nitol Solar and to Nitol Solar's owners, including the duties of loyalty and care.

170. By reason of the aforesaid, the Nitol Insiders breached those duties to Nitol Solar and the Nitol Solar owners, including Plaintiff.

171. As a result of those breaches, Nitol Solar and Plaintiff have suffered damages.

172. The Nitol Insiders' actions were so willful, wanton, reckless, and malicious as to warrant an award of punitive damages.

WHEREFORE, Plaintiff, Neas Limited, demands judgment in its favor and against Defend-

1    ants, Sergei Polikarpov and Valery Rostokin, in an amount in excess of $75,000, plus punitive dam-

2    ages, costs, and whatever other relief this Court deems necessary just and appropriate.

3                        **FOURTEENTH CLAIM FOR RELIEF**
     **PLAINTIFF, NEAS LIMITED, individually and on behalf of NITOL SOLAR v.**
4             **THE RUSNANO GROUP, THE RUSNANO CONTROL PERSONS**
                    **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
5

6         173.    Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if

7    set forth at length herein.

8         174.    By reason of the aforesaid, the RUSNANO Group and the RUSNANO Control Per-

9    sons, as active participants, caused the Nitol Insiders to breach their fiduciary duties to Nitol Solar

10   and to Nitol Solar's owners, including Plaintiff Neas.

11        175.    The RUSNANO Group and the RUSNANO Control Persons had full knowledge that

12   each of the Nitol Insiders owed those fiduciary duties to Nitol Solar and the Nitol Insiders at the time

13   that they caused the Nitol Insiders to breach those fiduciary duties.

14        176.    As a result of those breaches, Nitol Solar and its owners, including Plaintiff, have

15   been damaged.

16        177.    The RUSNANO Group's and the RUSNANO Control Persons' actions were so will-

17   ful, wanton, reckless, and malicious as to warrant an award of punitive damages.

18        WHEREFORE, Plaintiff, Neas Limited, demands judgment in its favor and against Defend-

19   ants, OJSC RUSNANO, RUSNANO Management Company, LLC, RUSNANO Capital, A.G.,

20   RUSNANO Capital, LLC, RUSNANO USA, Inc., Anatoly Chubais, Oleg Kiselev and Irina Rap-

21   paport in an amount in excess of $75,000, plus costs, punitive damages, and any other relief that this

22   Court deems necessary, just, and appropriate.

23                       **FIFTEENTH CLAIM FOR RELIEF**
     **PLAINTIFF, NEAS LIMITED, individually and on behalf of NITOL SOLAR v. THE**
24         **RUSNANO GROUP, CHUBAIS, KISELEV, RAPPAPORT AND SHERIGO**
                            **FRAUDULENT TRANSFER**
25

26        178.    Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if

27   set forth at length herein.

28        179.    The RUSNANO Group fraudulently converted the INSQU shares from Nitol Solar

1 and transferred them to Sherigo for less than full value.

2       180.   The transfer of the INSQU shares were made by Defendants with full knowledge of

3 Nitol Solar's claim of right, title, and interest in the INSQU shares and without regard to Nitol Solar's

4 claim of right, title and interest in the INSQU shares.

5       181.   Nitol Solar has been damaged by its loss of investment and loss of control over the

6 Nitol Plant, without limitation.

7       WHEREFORE, Plaintiff, Neas Limited, demands judgment in its favor and against Defend-

8 ants, OJSC RUSNANO, RUSNANO Management Company, LLC, RUSNANO Capital, A.G.,

9 RUSNANO Capital, LLC, RUSNANO USA, Inc., Anatoly Chubais, Oleg Kiselev, Irina Rappaport

10 and Sherigo Resources Limited in an amount in excess of $75,000, plus costs, punitive damages, an

11 Order setting aside the fraudulent transfer and any other relief that this Court deems necessary, just,

12 and appropriate.

**SIXTEENTH CLAIM FOR RELIEF**
13
**PLAINTIFF, NEAS LIMITED, individually and on behalf of**
14                        **NITOL SOLAR v. ALL DEFENDANTS**
**CIVIL CONSPIRACY**
15

16       182.   Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if

17 set forth at length herein.

18       183.   Defendants conspired against Plaintiff Neas to commit the torts of common law

19 fraud, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty.

20       184.   Defendants acted in concert with the specific object of harming Plaintiff Neas and Ni-

21 tol Solar, all for their own personal gain.

22       185.   The unlawful acts alleged herein were committed in furtherance of that conspiracy.

23       186.   As a result of the Defendants' combined and concerted efforts, Plaintiff Neas and Ni-

24 tol Solar were damaged.

25       187.   Defendants' actions were so willful, wanton, reckless and malicious as to justify an

26 award of punitive damages.

27       WHEREFORE, Plaintiff, Neas Limited, demands judgment in its favor and against all De-

28 fendants in an amount in excess of $75,000, plus punitive damages, costs, and any other relief that

this Court deems necessary, just, and appropriate.

### SEVENTEENTH CLAIM FOR RELIEF
### PLAINTIFF, NEAS LIMITED, individually and on behalf of
### NITOL SOLAR v. RUSNANO GROUP
### ACTION TO PIERCE THE CORPORATE VEIL

188.    Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if set forth at length herein.

189.    Plaintiff Neas believes and therefore avers that RUSNANO and its directors, officers, and executives dominate and control each member of the RUSNANO Group, and have actively participated in the unlawful conduct complained of herein.  As active participants and as mere instrumentalities of RUSNANO, none of the members of the RUSNANO Group are entitled to the limited liability protections of the corporate form.

190.    Plaintiff Neas further believes and avers as aforesaid that RUSNANO and the members of the RUSNANO Group have misused the corporate form, disregarded corporate formalities, and improperly blurred any distinction among them to a degree that each member of the RUSNANO Group has rendered the corporate form meaningless, rendering each an alter ego of RUSNANO, and, by extension, of each of other for purposes of this action.

191.    Additionally, all members of the RUSNANO Group are commonly owned by RUSNANO and, individually and collectively, are mere instrumentalities and conduits of RUSNANO utilized in the pursuit of a single business venture.  Each member of the RUSNANO Group has integrated its assets and operations with each other member of the RUSNANO Group to achieve a common, singular business purpose of growing the Russian Federation's state-owned nanotechnology business through investment of Russian government funds in Russia and abroad.

WHEREFORE, Plaintiff, Neas Limited, demands judgment in its favor and against all Defendants in an amount in excess of $75,000, plus punitive damages, costs, and any other relief that this Court deems necessary, just, and appropriate.

### EIGHTEENTH CLAIM FOR RELIEF
### PLAINTIFFS v. DEFENDANTS
### CALIFORNIA BUSINESS AND PROFESSIONS CODE § 172000

192.    Plaintiffs incorporate the preceding paragraphs of this Complaint by reference as if

set forth at length herein.

193. Defendants have engaged in and continue to engage in unlawful, unfair or fraudulent business acts or practices as outlined in this alleged in this Complaint, including, without limitation, violation of RICO.

194. Pursuant to Business and Professions Code § 17203 plaintiffs are entitled to injunctive relief. Plaintiffs also seek restitution and disgorgement of revenue and or profits realized by defendants, and each of them, as a result of their unlawful, unfair, or fraudulent business practices or acts as outlined herein.

WHEREFORE, Plaintiffs demand an injunction and judgment in their favor and against all Defendants in an amount in excess of $75,000, costs, and any other relief that this Court deems necessary, just, and appropriate.

## **PRAYER**

By reason of the aforesaid, Plaintiffs, Neas and Tretyakov, seek the following:

1. An award of actual damages in excess of $10,000,000 as against all Defendants, jointly and severally;

2. An award of restitution against all Defendants, jointly and severally;

3. An award of punitive damages as against all Defendants, jointly and severally;

4. Injunctive relief as needed to maintain the status quo and prevent Defendants from undertaking further unlawful acts;

5. Reasonable attorney's fees and costs as permitted by applicable law;

6. Costs, and pre-judgment interest as permitted by law;

7. Equitable relief including, without limitation, disgorgement of profits and/or gross revenues realized by Defendants;

8. Such other relief as may be deemed just and equitable.

Dated: April 8, 2015.                    FOX ROTHSCHILD LLP


                                          By s/Michael A. Sweet
                                          Michael A. Sweet
                                          Attorneys for Plaintiffs

1

## **JURY DEMAND**

2      Plaintiffs demand a trial by jury of all issues so triable.

3  Dated:  April 8, 2015.            FOX ROTHSCHILD LLP

4

5                        By s/Michael A. Sweet

6                           Michael A. Sweet
                            Attorneys for Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28