# ACCOUNTS CHAMBER OF THE RUSSIAN FEDERATION

*May 16, 2013*                                                            *No. OM-89/12-04*

## REPORT
## OF THE OVERSIGHT AUDIT FINDINGS
### Audit of the use of the federal budget funds received in 2007-2012 by RUSNANO (Russian Nanotechnology Corporation, a Government Corporation), and of the expenditures to verify compliance with the requirements

(Approved by the Panel of the Accounts Chamber of the Russian Federation (Minutes No. 20K (910), dated April 26, 2013)

1. Grounds for the oversight audit: Item 2.6.7.7 of the Accounts Chamber of the Russian Federation's Action Plan for 2012; Item 2.3.8.1 of the Accounts Chamber of the Russian Federation's Action Plan for 2013; action No. KHB-135 enacted by the State Duma legislators representing the Russian Federation Federal Parliament, dated November 23, 2012 (1/5 of total number of legislators).

2. The area covered by the oversight audit:

Legislative, regulatory, and other records that regulate the operations of OJSC RUSNANO (Russian Nanotechnology Corporation, a Government Corporation), including the internal corporate regulations;

Documents and other records required by Federal Law No. 211-ФЗ, dated July 27, 2010, *On the Reorganization of the Russian Nanotechnology Corporation*;

Programs, plans, reports, and records produced by OJSC RUSNANO (Russian Nanotechnology Corporation, a Government Corporation), including those pertaining to the efficiency of the federal budget funds usage;

Accounting, financial, production, statistical, and other reports; balance sheets and progress reports;

Contracts, deals, and agreements, including all records related to the negotiations and execution thereof;

Payment, financial, banking, and other original records that serve as proof of financial and business transactions;

Reference and information materials regarding the corporate, financial, and business operations, and the compliance with the required purposes.

3. The entity covered by the oversight audit: Open Joint Stock Company RUSNANO.

4. The time-frame of the oversight audit: from December 2012 through April 2013.

5. The purposes of the oversight audit are:

5.1. To verify if the federal budget funds received by OJSC RUSNANO (Russian Nanotechnology Corporation, a Government Corporation) are properly spent as intended.

5.2. To determine how efficiently OJSC RUSNANO (Russian Nanotechnology Corporation, a Government Corporation) is using the funds (assets), including federal budget funds, to reach its mandated goals.

6. The period of operations under review: 2007 - 2012.

7. A brief description of the audited budgeting process, the utilization of public funds, and the operations of the audited entity.

Russian Nanotechnology Corporation, a Government Corporation (hereinafter referred to as Rusnanotekh, or the Corporation) has been created pursuant to federal law No. 139-ФЗ, dated July 19, 2007, *On the Russian Nanotechnology Corporation* (hereinafter referred to as the Federal Law On the Russian Nanotechnology Corporation), and was subsequently reorganized into OJSC RUSNANO pursuant to federal law No. 211-ФЗ, dated July 27, 2010, *On the Reorganization of the Russian Nanotechnology Corporation* (hereinafter referred to as the Federal Law On the Reorganization of the Russian Nanotechnology Corporation).

As used in this report, the name RUSNANO is used when describing the time frame when Rusnanotekh and OJSC RUSNANO were active.

From September 7, through September 21, 2008, the General Director of Rusnanotekh was L.B. Melamed; from September 22, 2008 through March 11, 2011, the General Director of Rusnanotekh was A.B. Chubais. From March 11, 2011 through the present time, A.B. Chubais is the chairman of the Board of OJSC RUSNANO.

8. The findings of the oversight audit are as follows:

### 8.3. Summary of the five-year financial and business operations of RUSNANO.

The reorganization of Rusnanotekh was completed on March 11, 2011. This is certified by an entry made in the Unified National Register of Legal Entities to the effect that the Corporation is terminated due to its reorganization into OJSC RUSNANO.

The key financial and business indicators of OJSC RUSNANO for 2011-2012 are provided in the following table.

In thousand rubles

| Parameter name | 2011 | 2012 |
|---|---|---|
| Intangible assets | 112 786 | 86 196 |
| Fixed assets | 4 257 494 | 4 294 203 |
| Financial investments | 91 293 531 | 100 341 542 |
| Including: | | |
| Contributions to Authorized Capital funds | 66 394 345 | 79 273 702 |
| Loans with more than 12-months maturity | 24 899 186 | 21 067 840 |
| Accounts receivable | 9 194 040 | 13 709 895 |
| Financial investments (excluding cash equivalent) | 61 993 905 | 70 346 777 |
| Including: | | |
| Loans with less than 12-months maturity | 4 993 905 | 7 769 397 |
| Authorized capital | 6 500 000 | 53 741 700 |
| Unallocated profit | 53 015 291 | 28 646 795 |
| Long-term borrowings | 67 600 000 | 104 033 873 |
| Short-term borrowings | 382 824 | 3 076 784 |
| Accounts payable | 47 420 128 | 3 852 300 |
| Revenue | 2 715 995 | 6 020 716 |
| Net profit (loss) | (2 969 038) | (24 369 196) |

In 2012, the resulting loss comprising 24,369.1 million rubles was caused by the negative financial results of the current operations of the company (calculated at 2,526.0 million rubles), and the formulation of a reserve fund for OJSC RUSNANO, which was listed as miscellaneous expenses, to cover depreciating financial investments totaling 21,843.1 million rubles.

According to OJSC RUSNANO, the formulated reserve fund is sufficient to cover potential losses related to the steady depreciation of the financial investments.

At the same time, it is worth noting that the Russian accounting standards do not provide for a retroactive increase in the value of financial investments.

The financial investments depreciation data for OJSC RUSNANO are provided in the following table.

| Name of the project company | ID (project identifier) | OJSC RUSNANO interest in the Authorized Capital, (%) | Balance sheet value as of 12/31/2012 (thousand rubles) | Reserve for depreciating financial investments (thousand rubles) |
|---|---|---|---|---|
| Sherigo Resources Limited | 854 | 58.75 | 9,400,058.20 | 9,400,058.20 |
| Monocrcrystal Holdings N.V. | 1551 | 4.98 | 1,177,162.57 | 813,000.00 |
| ItN Nanovation AG | 1302 | 26.63 | 639,702.54 | 245,000.00 |
| CJSC Optikovolokonnye Systemy | 1050 | 47.73 | 1,295,020.18 | 424,000.00 |
| CJSC Galileo Nanotekh | 834 | 48.80 | 923,296.00 | 875,000.00 |
| Plastic Logic Holdings PLC | 1340 | 44.79 | 7,126,113.03 | 3,279,000.00 |
| Nanotek Holdings Limited | 1648 | 48.42 | 911,000.00 | 259,000.00 |
| CJSC Novye Instrumentalnye Resheniya | 448 | 49.98 | 500,300.00 | 38,000.00 |
| Lithium-Ion Technologies, LLC | 1241 | 60.00 | 2,422,551.91 | 1,463,000.00 |
| Connector Optics, LLC | 952 | 45.01 | 270,060.00 | 270,060.00 |
| Cutting And Technology, LLC | 1945 | 48.28 | 2,599,902.14 | 1,301,000.00 |
| | | Total | 27,265,166,57 | 18,367,118.20 |

RAS 19/02 *Accounting of Financial Investments* approved by Order No. 126н of the Ministry of Finance of Russia, dated December 10, 2002, describes financial investments depreciation as significant steady depreciation of financial investments (if their current market value cannot be determined) below the level of economic benefits that an organization would have expected to receive from such financial investments in its regular course of business.

According RAS 19/02, the depreciation of financial investments is allowed if there is a steady substantial depreciation of financial investments characterized by the following concurrent conditions:

As of the current and previous reporting dates, their balance sheet value is substantially higher than their imputed value;

During one fiscal year, the imputed value of the financial investments has been substantially changing towards reduction without reversals;

As of the reporting date, there are no indicators that such financial investments may substantially increase their imputed value in the future.

Based on the depreciating financial investments estimation standards, the estimate made by OJSC RUSNANO appears incomplete because the aforementioned project companies are not the only entities that reduced their financial assets.

Furthermore, RAS 19/02 has no methodology to determine the imputed value of financial investments, and each entity may determine it individually.

The Russian Federation is the sole stockholder in OJSC RUSNANO.

As of December 31, 2011, the Russian Federation held 6,500 thousand shares; based on the OJSC RUSNANO performance in 2011, the loss per share comprised 0.4599 rubles.

As of December 31, 2012, the Russian Federation held 53,741.7 thousand shares; based on the OJSC RUSNANO performance in 2012, the loss per share comprised 0.5313 rubles.

During the oversight audit, the causes of the negative financial and business performance results of OJSC RUSNANO and the existing systematic problems were analyzed. Consequently, the following significant factors were uncovered:

1) The projects implemented with the involvement of RUSNANO were economically unattainable.

The projects are implemented if there is a business plan that sets forth the dynamics of the key financial and economic indicators of a project and provides for a subsequent departure of RUSNANO from such project including the recovery of invested funds and the repayment of an effective interest if a loan was provided. However, a number of projects are not implemented in a timely manner and are not profitable due to incorrect calculations used in the project feasibility studies, or due to errors and improprieties committed during the actual implementation of the projects.

As of now, some project companies has not yet started the implementation of their business purposes and goals.

2) The net assets of the project companies was reduced below the value of their Authorized Capital.

The negative financial and business performance results and the unprofitability of the project companies resulted in the depreciation of the net assets and the rise of the Authorized Capital above the value of the net assets.

If net assets of a company drop below its Authorized Capital and such reduction is ongoing, it gives grounds for the application of Article 35 of the federal law No. 208-ФЗ, dated December 26, 1995, *On Corporations*, to enact a reduction of the Authorized Capital of a company or its liquidation. In violation of the existing corporate law, the executive boards of the project companies, which were formed to include OJSC RUSNANO representatives, do not take such actions.

3) Contributions made to the project companies by stockholders are overvalued when their assets are estimated and contributed to the Authorized Capital of the project companies.

The Authorized Capital of the project companies is created by contributions made by RUSNANO and other stockholders of corresponding projects. The oversight audit has found that the RUSNANO contributions are made solely by money while the contributions of other stockholders are made primarily by property and intangible assets appraised in an evaluation process.

In some cases, there are doubts about the economic rationale used to determine the market value of the tangible/intangible contributions from the third parties.

4) False or overvalued collateral accepted by RUSNANO to secure the investments in the project companies.

For the 9 months of 2012, according to OJSC RUSNANO accounting reports, collateral worth 150,501.59 million rubles was placed on off-balance account No. 008 *Obtained Liabilities and Payment Security*. However, in some projects, a foreclosure of assets taken as collateral cannot cover all potential losses and expenses incurred by RUSNANO through investments to the project companies.

For example, the market value of 7 intellectual property items taken as a contribution to the Authorized Capital of the project company NTfarma, LLC was appraised at 156 million rubles, as of June 1, 2010. However, when a loan from Rusnanotekh was obtained, the value of the same intellectual property items was estimated at 529.3 million rubles, i.e. 3.4 times higher. Furthermore, the appraisal of each intellectual property item was not transparent.

When assets were appraised as collateral and accepted by RUSNANO, in many cases there was no independent appraiser; also, the liquidity of the property and the expenses needed to sell it were not considered.

5) Conversion and restructuring of the debt incurred by the project companies.

In some cases, given the lack of economic feasibility of the projects, RUSNANO performs a debt re-structuring that delays a bankruptcy of the project companies and hides their actual financial performance.

Specifically, between 2010 and September, 2011, the performance of CJSC Optogan resulted in the loss of 2,355.77 million rubles. The board of OJSC RUSNANO (Minutes No. 45, dated December 4, 2012) considered the aforementioned project implementation results and decided to refinance the project with 2,000 million rubles by converting the loan (1,453.00 million rubles) and the loan interests (325.81 million rubles), and by purchasing an additional issue of stock (221.19 million rubles).

6) The implementation of projects that are clearly not related to the nano-industry (nanotechnologies), or received negative reviews from some experts.

For example, in 2009, Rusnanotekh provided funding to an investment project 821, Creating a Russian Inventory of Chemical and Biochemical Agents. The primary goal was to create a warehouse in Moscow to store foreign chemical and biochemical agents. This project is for a broker organization trading in chemical agents and medical equipment. It is not related to the purposes and goals of OJSC RUSNANO, which is primarily confirmed by the fact that revenues of this organization have never been included in the revenues of the RUSNANO project companies that produced nano-products in 2010-2012.

Likewise, even though expert opined that project *Nano-Production of Non-Spherical Optical Elements* is based on the technologies of 1970s-1980s and does not have any innovative components, the board of Rusnanotekh decided to fund it in 2008. As a result, 4.3 million Euros of the allocated money

were kept on the account of a non-resident company for more than nine months and were returned to the Corporation because the co-investor decided to drop the project.

7) The implementation of projects with Russian and foreign companies that are about to enter bankruptcy or even operating under bankruptcy administration.

A more detailed description of the above information is provided in the following section of the report with details about some projects.

### 8.4.2. Project ID 1549, RUSNANO Capital: creating an international nanotechnologies fund

In 2009, the Rusnanotekh management decided to implement a project called RUSNANO Capital, the creation of an international nanotechnologies fund (hereinafter in section referred to as the project).

According to actions taken by the executive boards of Rusnanotekh, 1 billion US dollars was planned to be invested in this project. In order to involve a RUSNANO-affiliated subsidiary company in the joint international nanotechnology funds, they set the following key conditions:

The interest should not exceed 50% of the total size of each joint international fund;

The international funds were required to finance Russia-based projects (at least matching the RUSNANO's commitments to such funds).

However, according to M.V. Kovalchuk, the member of the Supervisory Board of Rusnanotekh and the Director of the Kurchatov Research Institute, the materials submitted to the Supervisory Board of Rusnanotekh did not provide sufficient justification for the need to create such a structure at the time when there was no funding for the infrastructure and education projects important for the domestic nanotechnology industry, and for the megaprojects and R&D funded previously by the Ministry of Education and Science of Russia through targeted federal programs.

According to V.A. Dmitriev, a member of the Supervisory Board of Rusnanotekh, the management company should have been created with involvement of Russian financial institutions.

Rusnano Capital A.G. was registered in Zurich (Switzerland) and is a 100% subsidiary of RUSNANO. Pursuant to Bylaws of Rusnano Capital A.G., the main purpose of its business is to provide consulting services for high-tech and nanotechnology investments in Russia.

Fonds Rusnano Capital S.A. is a joint stock company created and existing under the law of the Grand Duchy of Luxembourg. According to Bylaws, Fonds Rusnano Capital S.A.'s business is the engagement in any form of holding operations with Luxembourg and foreign companies, any form of investments, acquisitions through purchases, equity subscriptions or otherwise, disposition of equity by sale, exchange or otherwise, and management, control and development of its own portfolio.

The staff of Fonds Rusnano Capital S.A. (Luxembourg) has only 3 people (the Board of Directors; it also lists I.M. Rapoport as one of them).

The staff of Rusnano Capital A.G. (Switzerland) has only 5 people including the Board of Directors (including A.B. Chubais, O.V. Kiselyov, and I.M. Rapoport).

The actual control over the project is exercised by RUSNANO Capital, LLC (I.M. Rapoport is the General Director), and it is affiliated with Rusnano Capital AG.

In 2010-2012, RUSNANO transferred 440.0 million US dollars to Fonds Rusnano Capital S.A.'s accounts; however, the international nanotechnology funds received only 128.9 million US dollars (29.3% of the allocated funds).

Therefore, 311.1 million US dollars (70.7% of the allocated funds) transferred by RUSNANO to Fonds Rusnano Capital S.A. are not used to attract foreign investments into joint international nanotechnology funds. These funds are deposited in foreign banks, and they are also used to purchase and sell securities of various companies, including Alrosa, Emirat Air, Evraz Group, etc.

Furthermore, in 2011-2012, 1.9 million US dollars of these funds were spent on services procured from RUSNANO Capital, LLC under a consulting services contract. The consulting services included marketing, legal, engineering, and other administrative services, and services to select banks to deposit available money. Moreover, a supplementary agreement to the consulting services contract provided for an additional annual bonus payment to RUSNANO Capital, LLC. Also, Fonds Rusnano Capital S.A. used 1.3 million US dollars on financial adviser services (Axioma Wealth Management AG).

However, the funds transferred to Fonds Rusnano Capital S.A. by OJSC RUSNANO were earmarked for investments in the international nanotechnology funds. Rusnano Capital A.G. was created in order to manage Fonds Rusnano Capital S.A.. It was tasked with providing the investment consulting services in high technologies. To ensure the operations of Rusnano Capital A.G., RUSNANO transferred 195 million rubles to this company.

Therefore, there are indicators that 3.2 million US dollars were inappropriately used by Fonds Rusnano Capital S.A. on consulting services provided by third parties even though such function were assigned to Rusnano Capital A.G.

Additionally, there are signs of affiliation with respect to the execution of the consulting services contract and the performance thereunder because I.M. Rapoport at the same time served as a member of the Board of Directors in Fonds Rusnano Capital S.A. and the General Director of RUSNANO Capital, LLC.

Fonds Rusnano Capital S.A. assumed obligations to invest in the following funds: Celtic Pharma Holdings II LP (the Island of Guernsey, the Channel Islands, Great Britain) (an offshore company); Celtic Pharma Holdings III LP (the Island of Guernsey, the Channel Islands, Great Britain) (an offshore company); the Asian Nanotehnology Fund (South Korea); NANOENERGO FUND LIMITED (Cyprus) (an offshore company); I2BF-RNC STRATEGIC RESOURCES FUND L.P. (the Cayman Islands) (an offshore company).

The assets of the Celtic Pharma Holdings II LP fund (51.8 million US dollars provided by OJSC RUSNANO) were invested in project companies located in Malta and Great Britain.

At the same time, the Celtic Pharma Holdings II LP fund agreed to provide assistance to help RUSNANO reach its strategic goals to develop the Russian nanotechnology base which will enable the Russian Federation to become an important global developer and supplier of new technologies.

The Celtic Pharma Holdings II LP fund failed to provide to RUSNANO the aforementioned investment requirements. The investments in Russian companies (Bonno LLC and OJSC Bonno) from the Celtic Pharma Holdings II LP fund were only 2.0 million rubles, which is cannot be reconciled with

RUSNANO investments in this fund (51.8 million US dollars).

The Celtic Pharma Holdings II LP fund Russian companies are engaged in the import and distribution of two medical products in Russia. There are no documents to prove that these companies intend to set up a local production of medications and medical products in the Russian Federation in the future.

Back in 2010, 150 million US dollars were transferred to Fonds Rusnano Capital S.A. by RUSNANO to take part in the Celtic Pharma Holdings III LP fund. As of now, they have not been invested in the nanotechnologies and are still held in Fonds Rusnano Capital S.A.'s accounts.

At the same time, as part of the investment requirements, the Celtic Pharma Holdings III LP fund agreed (through Accounts Chamber of the Russian Federation) to invest funds in the production of pharmaceuticals and to create a structure to promote and sell pharmaceuticals and biotechnology products.

In reality, the Celtic Pharma Holdings II LP fund began to comply with the funding requirements of Celtic Pharma Holdings III L.P. (with respect to Accounts Chamber of the Russian Federation); however, it was not provided in the investment requirements set forth to the Celtic Pharma Holdings II LP fund. Therefore, there is a risk that Celtic Pharma Holdings II LP will not develop its project companies (Bonno LLC and OJSC Bonno) to the point of producing pharmaceuticals in the Russian Federation.

At least 50% of the investment capital of the Asian Nanotechnology Fund were supposed to be invested in nanotechnology projects in Russia.

As of now, this fund is being liquidated. 0.49 million US dollars of OJSC RUSNANO funds were invested in this fund without results.

The primary goal of the NANOENERGO FUND LIMITED is long-term growth of capital due to the investments made in stockholder equity of the companies that implement modern nanotechnology and innovation projects in the area of energy and resources utilization efficiency in Russia.

The assets of the NANOENERGO FUND LIMITED were not transferred for such purposes. In total, OJSC RUSNANO invested 50 million US dollars in this fund.

However, the NANOENERGO FUND LIMITED described the risks associated with investing into it, including the lack of guarantees in terms of achieving investment purposes; the liquidity risks; the ineffective management risks; the risk of no return on investments.

The purpose of I2BF-RNC Strategic Resources Fund partnership is to invest in foreign (non-Russian) companies that develop innovative technologies or projects in the resource sector with the purpose of developing and applying such technologies in the Russian Federation.

The assets of the I2BF-RNC Strategic Resources Fund were invested in the stock of Solix Biosystems Inc. (Colorado, USA) that created a subsidiary in Russia, Solix BioSystems East, LLC. The Authorized Capital of Solix BioSystems East, LLC is only 15.0 thousand rubles, which cannot be reconciled with the investments made by OJSC RUSNANO into this fund (26.6 million US dollars).

Therefore, the above information indicates that OJSC RUSNANO transferred almost 13.5 billion rubles in total to the subsidiaries, Fonds Rusnano Capital S.A. (Luxembourg) and Rusnano Capital AG (Switzerland), which were not spent as intended (to develop nanotechnologies in the Russian Federation)

and remain overseas.

The following section of the report describes some issues related to the implementation of certain RUSNANO projects in the Russian Federation.

### 8.4.3. Project ID 1000; Construction of a solar module production plant based on the Oerlikon thin film technology.

In 2009, the Rusnanotekh management decided to get involved in the construction of a solar module production plant based on the Oerlikon thin film technology (hereinafter referred to in this section as the project). The co-investor in this project was Beluna Investments Limited Investments Limited, a Cyprus company, which belongs to ROS-Holding ltd. (Renova Orgsintez Holding).

At the project pre-investment stage, the Rusnanotekh experts from the Science and Technology Council described the following problems which significantly increase the risks associated with this project:

The requested volume of investments is unreasonably high; the cost of a similar project with Applied Material was less than 200 million US dollars;

Materials presented for the review had no schedule for the implementation of all investment funds by their purposes which prevented the experts from making assessments as to their intended use;

The advantages of placing the company in the Russian Federation were not sufficiently substantiated in terms of competitive advantages, available raw materials and components, number of created jobs, and other social factors;

After the project is implemented, the research and development would still be concentrated in the Oerlikon Solar R&D centers in Switzerland; in the Russian Federation, only the ongoing specification compliance testing and product quality assurance will be conducted at a production lab expected to be created;

The project incorrectly claimed that Oerlikon thin-film modules are the only commercially feasible PV converters;

Applied Materials modules are more cost competitive than those of Oerlikon, and they have been in production since 2008. According to Applied Materials, the module price was expected to be 1.8 $/W in 2009; the price of the Oerlikon modules in 2009 was planned to be 2.4 $/W.

Also, one of the experts noted that PV converters (as a product) are not needed very much in Russia (since Russia is a northern country and the application of the products under this project will be limited in Russia).

Despite these remarks, the project was approved by the executive boards of Rusnanotekh. S.S. Polikarpov, the Managing Director of Rusnanotekh, was the keynoter at the hearings of the executive boards of Rusnanotekh.

In 2009, the investment contract was signed between Rusnanotekh (represented by A.B. Chubais, the General Director) and Beluna Investments Limited Investments Limited (represented by V.F. Vekselberg). Subsequently, this investment contract was amended including the adjustment of the

implementation and benchmarks schedule, and the dates for the completion of the plant construction were postponed. The original plan was to complete the plant constructed by December of 2011. However, as of now, the construction has not been completed.

The total amount of funding for this project was 20,128.13 million rubles including: the contribution of 3,705.08 million rubles from Rusnanotekh, and 3,856.31 million rubles from Beluna Investments Limited made to the Authorized Capital of Khevel, LLC, LLC; the loan money including 9,820.00 million rubles from Rusnanotekh and 2,746.73 million rubles from Beluna Investments Limited. The project was supposed to be completed in the I quarter of 2012.

A portion of money coming from Beluna Investments Limited (3,848.81 million rubles) to be contributed into the Authorized Capital was transferred to an account held by Nano Solar Technology, LLC (which was subsequently renamed Khevel, LLC, LLC) in OJSC Metkombank. According to information from the OJSC Metkombank Internet portal (www.metcom.ru), V.F. Vekselberg is one of the people who have substantial indirect control (through third parties) over the actions of the executive boards of OJSC Metkombank. Therefore, the above funds were deposited in a bank affiliated with V.F. Vekselberg.

As of now, Beluna Investments Limited has not provided the loan of 2,746.73 million rubles to Khevel, LLC which is a breach of Items 8.1, 5.1.11, and 10.5 the investment contract.

Under the Guarantee and Repayment Contract for the joint venture, dated July 29, 2009, ROS-Holding Ltd. provided guarantees to Rusnanotekh that Beluna Investments Limited would discharge its duties under the investment contract, including the provision of 2,746.73 million rubles in funding to the joint venture (Khevel, LLC).

Therefore, given the breach committed by Beluna Investments Limited under the investment contract (the failure to provide a 2,746.73 million ruble loan to Khevel, LLC), the management of OJSC RUSNANO failed to exercised the right provided to them by the Guarantee and Repayment Contract for the joint venture.

A one-time loan of 9,820 million rubles was provided to Khevel, LLC by Rusnanotekh. Subsequently, Khevel, LLC received 874.57 million rubles of income (estimated) after making deposits with these funds. Also, 8,800 million rubles from this loan were almost immediately deposited in OJSC Promsvyazbank, and additional 500 million rubles were deposited in the Khevel, LLC payment account held in bank Alemar.

Therefore, there was no economic need to give Khevel, LLC the one-time loan of 9,820 thousand rubles because the project was supposed to be implemented in stages. The one-time loan has increased the Khevel, LLC loan exposure because the interest was accrued on the entire loan which subsequently contributed to the growth of the overdue accounts receivable at OJSC RUSNANO related to the Khevel, LLC loan.

In a breach of the loan terms, there was no collateral contract to secure the equipment supplied by Khevel, LLC under the delivery contract made with Oerlikon Solar Ltd.

Even though the plant construction began in early 2010, the government approval and the construction permit were received by Khevel, LLC at the end of 2011.

The capital equipment for the operation of the Khevel, LLC plant was provided by Oerlikon Solar Ltd., which is primarily owned by the RENOVA Group. The contract price was 244,239.5 thousand

Euros.

Khevel, LLC paid 90 million rubles to MGAB JurGroup for business support legal services. The nature of the work was to analyze, monitor, and develop recommendations with respect to the regulations in the renewable energy power sector. However, these expenses were overblown and without results. Specifically, the majority of materials provided after the work was completed included correspondence between government agencies and freely available existing regulations. Furthermore, the provided materials had duplicates.

As of December 1, 2012, the overdue debt of Khevel, LLC on the interest payable for Rusnanotekh loan reached 3,578.85 million rubles. In 2009-2012, Khevel, LLC did not make any transfers to RUSNANO to pay off the loan interest.

Pursuant to a supplementary agreement to the funding contract, the reduced interest grace period was extended by 8 months. In essence, a restructuring of Khevel, LLC debt took place to conceal the actual financial results of the project.

The management OJSC RUSNANO had several options to collect from Khevel, LLC the overdue debt and the penalties assessed thereunder. However, it failed to exercise them.

Furthermore, when Rusnanotekh took the ownership interest of Beluna Investments Limited in the Authorized Capital of Khevel, LLC to use it as the collateral, the value of the interest was reduced by 342.47 million rubles.

CJSC Irkutskenergostroy (the contractor) was supposed to pay Khevel, LLC late charges for any delay in the commencement, intermediate, and completion benchmarks.

Khevel, LLC asked CJSC Irkutskenergostroy to pay the construction delay penalties of 623.04 million rubles only after the inquiry was made by the Accounts Chamber of the Russian Federation.

The uncovered facts indicate the existence of hidden lending from Khevel, LLC to the general contractor, CJSC Irkutskenergostroy. Specifically: 189.91 million rubles were made available to CJSC Irkutskenergostroy for more than 6 months.

The construction delays were noted in Khevel, LLC quarterly budget performance reports filed with RUSNANO. However, the RUSNANO management failed to act to remedy the situation.

As the result of the plant construction delays, there is a risk that Khevel, LLC will lose its market for products negotiated under delivery contracts with Solar Projects East ltd. and Avelar Energy ltd. because the contracts expired.

Due to construction delays (caused by ill-advised reasons), the business plan of the project was pushed back by more than 20 months, and the plant is scheduled to be commissioned in July of 2013.

This project cannot be regarded innovative because the technical and economic specifications of the products do not match the global standards, and the focus of sales is not the export (or replacing imports in the domestic market).

Due to high economic, legal, technological, and organizational risks, the project is very unattractive for investments.

The equipment purchased by Khevel, LLC from Oerlikon Solar AG is a modified line of the "1st generation of ThinFab". The efficiency of the PV modules produced with this technology is about 9%. In early 2012, Oerlikon Solar AG announced the "2nd generation of the ThinFab" technology with 12% module efficiency.

Therefore, the plant equipment become outdated while the plant was constructed.

Due to material changes in the market with excessive PV module production capacities and the overproduction of modules with higher efficiencies, the global market prices are dropping steadily. This market situation was caused, among other things, by a decline in the polysilicon prices. In 2008-2012, the price of this key raw material in the production of PV systems declined from 300-400 US dollars to 16 US dollars per kilo. The excess of the production capacities puts the pressure on prices within the entire PV market, including the production costs. Given such market conditions and the redistribution of the profitability (margins) within the added-value chain of this sector, a great demand for Khevel, LLC products in the market would be unrealistical.

The production cost of a module intended to be manufactured by Khevel, LLC is 1.07 Euros/W. However, in the world market, modules are priced as low as 0.43-0.578 Euros/W. Furthermore, the efficiency of the PV modules to be produced by Khevel, LLC is about 9%. In the global market, the majority of the sold modules have 12-15% efficiency; some pilot designs proved that solar energy transformation can achieve the efficiency of 30%.

Khevel, LLC decided to change its business model. Instead of attempting to sell this products in the open market, it would transition to a new business model where almost all volumes of Khevel, LLC products are channeled to the affiliated and subsidiary companies (SPV companies) at the transfer prices for a turn-key construction of solar power stations (SPP) with the subsequent marketing of the ownership interest in such SPV companies. However, the possibility of implementing this decision shall be determined by the ratio between the market prices and the transfer prices of the Khevel, LLC products (i.e. the possibility of implementing this decision would be higher is the market and transfer prices are converging).

If the affiliated or dependent SPV companies are forced (including the pressure from the executive boards controlled by Khevel, LLC and other Renova Group companies) to acquire the products from a single supplier (Khevel, LLC) at prices that are several times higher than the market price, it creates a risk that potential buyers would not be interested in buying the ownership in SPV companies, if this fact is discovered, and the risk of lawsuits seeking to recover losses incurred after the acquisition of the SPV companies, or the risk of prosecution by law enforcement agencies.

The Russian producers of PV modules and systems are unprofitable. Specifically, in 2009, the net loss of NPP Quant (Moscow) was 235 million rubles (26% of the revenues), and OJSC Ryazan Ceramic and Metal Works lost 38.0 million rubles (12% of the revenues).

Due to the lack of the market in Russia and overseas, Khevel, LLC is planning to sell the modules solely within the holding and at the transfer prices. New markets are unlikely, unless module specifications are drastically improved by the introduction of the planned R&D (in both technology and production).

A comparative study of the PV module production projects using thin film technology showed that the global average investment/capacity ratio for Oerlikon equipment with amorphous and micromorphous thin film technology is 3.15 US dollars/W. With Khevel, LLC, this ratio is 4.85 US dollars/W.

Currently, the funds of OJSC RUSNANO and Beluna Investments Limited (the co-investor) are almost completely exhausted. Khevel, LLC is struggling to pay the loan provided by OJSC RUSNANO.

For the above reasons, the OJSC RUSNANO management went to the Russian government seeking additional 14.0 billion rubles for the project implementation. Moreover, OJSC RUSNANO does not look at the other funding sources for the project (3.3 billion rubles). Specifically, 2.7 billion rubles supposed to be provided by the co-investor (Renova Orgsintez Group) which could be collected through a foreclosure of ROS-Holding Ltd., and 0.6 billion rubles which could be collected from the contractor (CJSC Irkutskenergostroy) for unreasonable construction delays.

After reviewing 2011 results, the Khevel, LLC Audit Commission noted that Khevel, LLC is lacking liquidity; the balance sheet shows significant capital borrowings while the 2011 revenue is small; there is zero profitability and business activity.

Therefore, the Khevel, LLC Audit Commission deems that Khevel, LLC has unstable financial standing. In 2011, Khevel, LLC spent more than 12.0 million rubles on security, including 2.9 million rubles on security at the Novocheboksarsk facility and 9.4 million rubles on Khevel, LLC office security in Moscow. Therefore, the security of the Khevel, LLC Moscow office costs more than 3 times higher than the security at the production plant where expensive equipment is located.

### *8.4.5. Project ID 854. Setting up production for polycrystalline silicon and silane.*

According to an action passed by the GK Rusnanotekh Supervisory Board and an action of the GK Rusnanotekh Board, the Corporation began to fund a project in 2009 (by providing a loan) to set up polycrystalline silicon production (hereinafter referred to as PSP) with an annual capacity of 3,800 tons and silane production at a joint industrial platform of the existing industrial companies - Usolekhimprom Ltd (hereinafter referred to as UHP, LLC) and Usolye-Sibirskoye Silicon, LLC (hereinafter referred to as USS, LLC); both are part of the Nitol Group, LLC—at the city of Usolye-Sibirskoye, Irkutsk Oblast.

Pursuant to a funding contract dated March 11, 2009, a loan of 4,500 million rubles was provided to the project company, USS, LLC, which, even though it was a resident company and belonged to Nitol Group, LLC (together with UHP, LLC), at that point in time, was primarily owned by foreign legal entities registered in offshore zones. Insqu Production Limited (the Republic of Cyprus) is a holding company which includes the chemical and silicone business of the parent company, Nitol Solar Limited (the Isle of Jersey).

Given the above, even though USS, LLC is a resident company, its key owners were non-resident companies and, therefore, the Corporation in essence has provided discount funding by granting a loan to USS, LLC, a foreign company that owned a portion of the production facilities in the Russian Federation.

It's worth noting that during the pre-investment stage, the experts pointed out that this was not an innovative project, the project has only marginal connection to nanotechnologies, the development of PSP from silane is a long-standing process and it was never treated as being part of nanotechnologies, the product manufacturing is based on standard western technology, furthermore, the most capital-intensive and costly technology.

Also noted were the obvious market risks of the project (the existence of a competitive block (more than 20 plants in China)), the oversaturation of the PSP market, the considerable declining trend in global prices (by more than 25 times compared to the pre-crisis period), and, consequently, the unprofitability of production.

Currently, the global PSP price is 16 US dollars per kilo (in 2008, it was 400 US dollars per kilo), and the PSP production cost exceeds its market price by more than ten times.

Therefore, given the above, this project could not have been deemed an attractive investment from the point of view of developing nanotechnologies and nanotechnology production in Russia; it is unprofitable and has the risks of losing investments.

It's worth noting that the original project implementation claims expecting to commence additional production of PSP and to achieve the annual capacity of 3,800 tons by the 1st quarter of 2010 have not been achieved, and, therefore, the plans to create an additional 365 jobs at the production facilities of USS, LLC have not materialized, which is a considerable social and economic setback.

This fact is the cause of serious concern for some municipal legislators in the city of Usolye-Sibirskoye. According to their reports, the existing situation with USS, LLC creates considerable social tension in the city because USS, LLC production dominates this one-industry town; there is information regarding job cuts due to the unprofitability of the endeavor.

During the project implementation, key benchmarks (start-up and commissioning, reaching the design capacity) were badly missed by 274 to 820 days (as compared to the July 1, 2011 and November 9, 2012 schedules).

At the OJSC RUSNANO Board meeting held in March of 2013, new project benchmarks were approved intending to reach the design production capacity of 3,300 tons by January 1, 2018; that means the original schedule for the project implementation was not met. Currently, the Corporation is expected to leave the project in 2022.

It's worth noting that, when compared to the original plans, the executive boards of the Corporation adopted drastically different financial involvement parameters during the implementation phase, which included new project organization and a new form of financial involvement in the project.

Pursuant to an action of the executive boards of GK Rusnanotekh, the changes made to the key project funding terms and the implementation of legal schemes involving the execution of certain contracts, an additional 16,000 million rubles were invested in the project in 2011 including 9,400 million rubles through OJSC RUSNANO; the co-investor's, SBERBANK CAPITAL, LLC, share was 6,600 million rubles.

These funds were used to purchase 100% of the stock in Sherigo Resources Limited (the British Virgin Islands), which was appointed as the new project company (the OJSC RUSNANO share was

58.75%; the OJSC SBERBANK CAPITAL share was 41.25%), and which, in turn, transferred some of the funds, comprising 15,800 million rubles, to purchase additional stock in Insqu Production Limited, the holder of the entire parental capital in the Nitol Group, LLC; at the time of the purchase, the market price of 100% of the stock was provisionally valued at 1 ruble (due to the negative value of the company's equity capital).

Subsequently, these funds were transferred as a monetary contribution to the Nitol Group, LLC, and, later on, to USS, LLC.

A similar situation developed when the following scheme was used during the implementation of this project.

Under the funding contract dated March 11, 2009, GK Rusnanotekh provided a repayable interest-bearing loan to USS, LLC totaling 4,500 million rubles (hereinafter referred to as the Loan) using two tranches: 3,000 million rubles transferred on April 13, 2009 and 1,500 million rubles transferred on September 18, 2009. Under the contract, USS, LLC was required to repay the obtained Loan by paying flexible interests with grace periods, as per the terms and conditions provided in the contract.

In order to approve the roles of the lenders for Nitol Solar Group (Joint-Stock Company Ecolive Limited (the Republic of Cyprus), Joint-Stock Company Nitol Solar Limited (the Isle of Jersey, the Channel Islands), Nitol Group, LLC, UHP, LLC, and USS, LLC), to appoint a security agent for the loan performance and collateral contracts, including the matters involving the distribution and accounting of funds obtained through foreclosures pursuant to the loan performance and collateral contracts made between GK Rusnanotekh, OJSC OJSC ALFA-BANK, USS, LLC, Joint-Stock Company Nitol Solar Limited, Solaricos Trading Limited (the Republic of Cyprus) and Ereswin Trustees Limited (security agent; the Republic of Cyprus), a contract was signed on March 11, 2009 to establish a trust fund to provide the collateral.

According to an unnumbered Stock and Shares Certificate Encumbrance Contract, dated March 13, 2009, executed between Joint-Stock Company Nitol Solar Limited, the sole stockholder in Insqu Production Limited, and Ereswin Trustees Limited, the Loan is secured by collateral comprising of 100% of the Insqu Production Limited stock, 14,871,664 shares in total, which, in turn, owns 100% of the stock in the Nitol Group, LLC.

On September 28, 2009, pursuant to an agreement dated March 11, 2009 (with subsequent amendments) made between the lenders to establish a trust fund to provide the collateral, which was executed earlier between GK Rusnanotekh, OJSC SBERBANK OF RUSSIA, OJSC OJSC ALFA-BANK, OJSC Bank Saint-Petersburg, USS, LLC, UHP, LLC, Joint-Stock Company Nitol Solar Limited, Solaricos Trading Limited, and Ereswin Trustees Limited, the lenders decided to appoint OJSC RUSNANO to act as the majority lender.

In a letter dated September 29, 2011, OJSC RUSNANO, acting as the majority lender, notified USS, LLC, OJSC SBERBANK OF RUSSIA, the Eurasian Development Bank, and the other stakeholders that USS, LLC breached its obligations to pay the interest on the Loan comprising 802.8 million rubles on

September 26, 2011 and failed to correct this breach within 2 business days.

Therefore, there was an enactment of the provision of Item 5 of the Stock and Shares Certificate Encumbrance Contract, dated March 13, 2009, executed between Joint-Stock Company Nitol Solar Limited and Ereswin Trustees Limited, the security agent, according to which the collateral, in the form of the encumbered shares of Insqu Production Limited, is immediately exercised and used to cover the overdue payment, if the Loan payments become overdue.

It's worth noting that according to a report dated September 26, 2011, compiled by an independent appraiser, Nexia Pacioli Consulting, LLC, the market value of 100% of the Insqu Production Limited stock was (provisionally) 1 ruble due to the negative value of the company's equity capital.

According to a written action of all creditors, dated September 29, 2011 and pursuant to the instructions from OJSC RUSNANO, the majority lender, Ereswin Trustees Limited, acting as the security (encumbrance) agent, transferred 100% of the Insqu Production Limited stock (14,871,664 shares) to Sherigo Resources Limited for a compensation comprising of 35 thousand US dollars payable to OJSC RUSNANO. A statement from acct. No. 40702840700007004684 held by OJSC RUSNANO, dated September 30, 2011, proves receipt of the funds from Sherigo Resources Limited totaling 35 thousand US dollars (comprising 1.1 million rubles).

Pursuant to a statement from the registry of stockholders (dated September 26, 2011), RUSNANO Metrological Center, LLC (a subsidiary of OJSC RUSNANO) was the only stockholder of Sherigo Resources Limited and the holder of 100% of the stock, totaling 16,000 shares.

Pursuant to actions made by the executive boards, acting under the Stock Sale and Purchase Contract dated October 6, 2011, OJSC RUSNANO acquired 16,000 shares of the company, constituting 100% of the original equity capital in Sherigo Resources Limited, from RUSNANO Metrological Center, LLC, for 48.1 thousand US dollars (comprising 1.5 million rubles).

Additionally, on October 4, 2011, the Board of Directors of OJSC RUSNANO approved the following actions of the OJSC RUSNANO Board: the contribution of 9,400 million rubles to the Authorized Capital of Sherigo Resources Limited to acquire 100% of the stock, which would become no more than 59% after Sherigo Resources Limited was funded by the co-investors in the project; the repayment of the Loan provided by OJSC RUSNANO to USS, LLC from the funds contributed by OJSC RUSNANO and the other Sherigo Resources Limited stockholders to pay for the stock of the project company.

On December 23, 2011, a shareholder agreement (hereinafter referred to as the Shareholder Agreement, dated December 23, 2011) with respect to Sherigo Resources Limited was executed between SBERBANK CAPITAL, LLC, OJSC RUSNANO, and Sherigo Resources Limited. It had specifically stipulated that the Sherigo Resources Limited stockholders and lenders wished to perform a corporate restructuring of the USS, LLC debt by applying an algorithm according to which the stockholders (OJSC RUSNANO and OJSC SBERBANK OF RUSSIA) and Sherigo Resources Limited agreed to seek appropriate actions from the Nitol Group, LLC and USS, LLC to execute proper documents (in which

they acted as the parties) to convert the USS, LLC debt. According to these documents, Sherigo Resources Limited and USS, LLC would indirectly exchange promissory notes for shares under the procedure where OJSC RUSNANO and OJSC SBERBANK OF RUSSIA will jointly subscribe to the Sherigo Resources Limited stock. In turn, Sherigo Resources Limited would acquire the stock of Insqu Production Limited, which would make a contribution to the assets of the Nitol Group, LLC in the amount received from Sherigo Resources Limited, and the Nitol Group, LLC would make a contribution to the assets of USS, LLC in the amount received from Insqu Production Limited.

Additionally, on that day, a contract was signed between OJSC RUSNANO, OJSC SBERBANK OF RUSSIA, the Eurasian Development Bank, SBERBANK CAPITAL, LLC, and Sherigo Resources Limited to perform a restructuring of the company, and it included the terms for the acquisition of stock through different tranches, the cost structure of the stock, and the financial debt of USS, LLC, which, at the time when the contract was signed, constituted  7,500 million rubles and 360 million US dollars just to these lending organizations (exclusive of interests).

Therefore, due to the actions made by the Board of Directors and the Executive Board of OJSC RUSNANO to fund this project, it turned out that as of September of 2011 Sherigo Resources Limited (a non-resident company; the British Virgin Islands) was acting as the project company for the project, and it owned 100% of the Insqu Production Limited stock (Cyprus), which in turn owned 100% of the Nitol Group, LLC stock. As of January 1, 2013, the Nitol Group, LLC included USS, LLC (100%), CJSC NPO SINEF ENGINEERING (100%), HSM, LLC (100%), NITOL Chemical Group, LLC (100%), UHP, LLC (100%), and some other minority-held organizations (SolSib, LLC, STM Group, LLC).

Overall, OJSC RUSNANO contributed 9,400 million rubles to the Authorized Capital of Sherigo Resources Limited (94,000,878 shares; holding 58.75% of the interest); OJSC SBERBANK CAPITAL contributed 6,600 million rubles (66,000,000 shares; holding 41.25% of the interest).

From this entire amount of 9,400 million rubles (the OJSC RUSNANO funds):

1.5 million rubles were transferred to RUSNANO Metrological Center, LLC for 16,000 shares of stock in Sherigo Resources Limited constituting 100% of the original equity capital;

9,398.5 million rubles were transferred to pay for the Sherigo Resources Limited stock under the stock acquisition contracts and from these:

- 598.5 million rubles were transferred in two payments (198.5 and 400,000 million rubles, accordingly) to bank account CY58003001790000017932327286 held by Sherigo Resources Limited in the Marfin Popular Bank Public Co. LIMITED (the Republic of Cyprus);

- 8,800 million rubles were transferred to the Sherigo Resources Limited payment account opened by OJSC SBERBANK OF RUSSIA.

From the aforementioned 598.5 million rubles, 400 million rubles were transferred as a loan to USS, LLC under an unnumbered contract dated October 21, 2011, which also provided for the transfer of

the additional 400 million rubles from the Sherigo Resources Limited account held in OJSC SBERBANK OF RUSSIA using the funds received from OJSC SBERBANK CAPITAL under the Stock Purchase and Sale Contract. The total amount of the loan reached 800.0 million rubles. The funds were subsequently returned (on March 30, 2012) and, on the same day, were transferred to purchase the additional Insqu Production Limited stock and later contributed to the Authorized Capital of USS, LLC (by making a monetary contribution to the assets of the Nitol Group, LLC).

In reality, 198.5 million rubles were retained in the account of Sherigo Resources Limited opened in Marfin Popular Bank Public Co. LIMITED (the Republic of Cyprus) and were not used for the purchase of the Insqu Production Limited stock; in part, they were used to pay for legal and consulting services to third-party organizations. As of December 31, 2011, the balance of the funds on the account was 171.7 million rubles; as of December 31, 2012, it was 135.1 million rubles; as of March 5, 2013, it was 134.6 million rubles.

A random audit discovered a number of payments made by Sherigo Resources Limited using the aforementioned account in Marfin Popular Bank Public Co. LIMITED (the Republic of Cyprus) totaling 5.0 million rubles and payable to Svyatovit A, LLC. The purpose of these payments was not discovered.

According to the Shareholder Agreement dated December 23, 2011, Sherigo Resources Limited purchased additional Insqu Production Limited stock in the 1st quarter of 2012 for 15,800 million rubles. At the same time, Insqu Production Limited used these funds to make a contribution to the assets of the Nitol Group, LLC for a total of 15,800 million rubles; and the Nitol Group, LLC made a contribution to the assets of USS, LLC using the same amount it received from Insqu Production Limited.

The results of the oversight action has shown that the actual funds received by USS, LLC were transferred in the first half of 2012, for the most part, to repay the loan debt in the amount of 11,000 million rubles to different lending organizations and to OJSC RUSNANO. From this amount, 9,426 million rubles, which in essence was equal to the OJSC RUSNANO investment (the acquisition of the Sherigo Resources Limited stock), were transferred just to repay the OJSC RUSNANO loan (5,648.3 million rubles) and to acquire foreign currency to repay the existing credit liabilities under contracts with OJSC SBERBANK OF RUSSIA (3,777.7 million rubles). An additional 881.5 million rubles were transferred to pay for opening a credit line with OJSC SBERBANK OF RUSSIA for yet another loan contract.

A portion of the funds was transferred as loans to UHP, LLC and the Nitol Group, LLC. For example, 185.2 million rubles were transferred to the Nitol Group, LLC. They were actually spent to pay salaries to individuals and resident employees, to pay for travel expenses, insurance premiums, the Social Insurance Fund and the Federal Compulsory Medical Insurance Fund penalties, personal income tax, and the Russian Federation Pension Fund payments.

Moreover, for example, in January of 2012, 11.3 million rubles were paid as an advance January 2012 salary payment for V.A. Rostokin, the General Director of USS, LLC, out of the total loan of 17.3 million rubles received on January 27, 2011. For the year 2012, the total salary payments to V.A. Rostokin were 33.8 million rubles, including a one-time bonus of 3.9 million rubles for April of 2012

(exclusive of entertainment and business travel expenses).

Such a level of compensation seems to be unreasonably high given the unprofitability of the Nitol Group, LLC and the social tension at the production facilities due to the need to maintain the number of jobs.

The overall volume of funding provided for the project by OJSC RUSNANO is 13.9 billion rubles. 4.5 billion rubles of these funds were provided as a loan, which was subsequently repaid to OJSC RUSNANO in the amount of 5.71 billion rubles (including the interest on the loan).

It's worth noting that according to the accounting reports of OJSC RUSNANO for 2012, 9.4 billion rubles were allocated to a reserve for the depreciation of financial investments (comprising 100% of the total 9.4 billion rubles balance-sheet value of Sherigo Resources Limited).

With respect to the operations of USS, LLC, it was notable that the company was unprofitable after the project was incorporated into USS, LLC. Specifically, the company's loss in 2009 was 406.7 million rubles; in 2010, it was 1,037.5 million rubles; in 2011, it was 1,751.3 million rubles; and in 2012, it was 1,561.4 million rubles.

At the same time, the volume of the borrowed funds as of December 31, 2009 was 11,911.5 million rubles; as of December 31, 2010, it was 16,041.7 million rubles; as of December 31, 2011, it was 21,622.0 million rubles; and as of December 31, 2012, it was 10,955.4 million rubles. In other words, even though it was reduced in half due to the fund investments of OJSC RUSNANO and SBERBANK CAPITAL, LLC, when compared to 2011, it is still significant given the unprofitability of the company.

Given these indicators and also the actively used Nitol Group, LLC practice of receiving and providing interest-bearing loans within the group using the investments coming from USS, LLC (including the loan) and the credit resources obtained by USS, LLC, an involuntary bankruptcy of the company in the not-so-distant future is quite possible.

Since the actual owners of the Nitol Group, LLC were the offshore companies Insqu Production Limited and Nitol Solar Limited, the deals involving the provision of intragroup loans show some signs of money laundering (one of the primary indicators is the provision of loans to offshore companies).

Specifically, according to data provided by USS, LLC (for the period that commenced when GK Rusnanotekh received the loan and contributed funds to USS, LLC through a stock purchase scheme with Sherigo Resources Limited, OJSC RUSNANO, and SBERBANK CAPITAL, LLC):

The total amount of contracts to provide loans from USS, LLC to UHP, LLC has reached 5,662.6 million rubles; 4,618.7 million rubles were paid for them;

The total amount of contracts to provide loans between USS, LLC and the Nitol Group, LLC has reached 4,435.6 million rubles; this includes 2,137.7 million rubles for the contracts to provide loans from USS, LLC to the Nitol Group, LLC.

At the same time, it was determined that the obtained loans were transferred to repay the already existing credit liabilities of the organizations. In other words, this was a process of relending funds to affiliated legal entities to cover their already existing liabilities.

For example:

Under contract No. GN 13/03-2009, dated March 13, 2009, USS, LLC provided a loan of 1,791.0 million rubles to the Nitol Group, LLC which, on the very next day, Nitol Group, LLC transferred to OJSC Bank Zenith to meet public offering liabilities, in other words, to redeem the Nitol Group, LLC bonds placed earlier with investors;

Under contacts No. 11И-2012/03-77, dated March 13, 2012, USS, LLC provided a loan of 58.2 million rubles to the Nitol Group, LLC, which was transferred to repay the promissory notes issued to OJSC NIKO-Bank.

Overall, out of the entire USS, LLC loan of 4,500 million rubles received from March 11, 2009 through December 31, 2010, the following transfers were made:

At least 1,327.1 million rubles were sent to purchase foreign currency, subsequently transferred to the Moscow Branch of OJSC Alemar Bank, and later transferred to Insqu Production Limited as a payment for equipment delivered under contracts; in other words, it was sent to an offshore company that, from January 1, 2010, through the present time, had 0 employees, including administrative and managerial staff;

At least 556.1 million rubles went to UHP, LLC as loans;

At least 855.8 million rubles went to CJSC NPO SINEF ENGINEERING under various service contracts, to support the contracts, to manage projects, to support the good working order of an integrated management system, to pay for product delivery contracts (various products: cable, electric equipment, pipeline fixtures, different services, etc.).

After analyzing bank statements related to USS, LLC accounts, it was determined that the performance under product delivery contract No. 2009/04-205, dated April 27, 2009, executed with CJSC NPO SINEF ENGINEERING (INN 7730500048; founded by A.V. Kotenko; 100% owned by Nitol Group, LLC, the Authorized Capital was 10 thousand rubles; located in Moscow) shows some signs of a false (fictitious) deal made to launder money and achieve tax benefits.

For example:

In 2009, under the aforementioned contract, 1,263.3 million rubles were transferred by USS, LLC to payment account No. 40702810861000061530 held by CJSC NPO SINEF ENGINEERING in OJSC Bank PETROKOMMERTS; out of this amount:

180.0 million rubles were transferred to USS, LLC on July 13, 2009, under loan agreement No. СИ-2009/60-3, dated July 10, 2009;

274.6 million rubles were returned under the aforementioned agreement to different accounts of USS, LLC;

452.1 million rubles were transferred (as the company's own funds) to some other payment accounts; whereas, out of this amount, 352.1 million rubles in total were transferred to payment account 40702810602800000470 (OJSC ALFA-BANK); out of this amount,

248.8 million rubles were transferred on July 23, 2009, and 248.7 million rubles of this sum were immediately retransferred on July 24, 2009, as a loan to USS, LLC, acct. 40702810102800000459 (OJSC ALFA-BANK), under loan agreement No. СИ-2009/60-3, dated July 10, 2009;

In 2010, 1,436.3 million rubles of funding were transferred; out of this amount:

472.3 million rubles in total were returned to different USS, LLC accounts under the aforementioned agreement;

91.3 million rubles in total were transferred under loan agreement No. СИ-2009/60-3, dated July 10, 2009, to various accounts of USS, LLC;

In 2011, 1,434.7 million rubles of funding were transferred; out of this amount, the return to various accounts was 420.0 million rubles;

In 2012, 592.2 million rubles of funding were transferred from account No. 40702810200020008410 (OJSC SBERBANK OF RUSSIA); out of this amount, the return comprised 230 million rubles.

Therefore, between 2009 and 2012, under product delivery contract No. 2009/04-205, dated April 27, 2009, CJSC NPO SINEF ENGINEERING annually returned some portions of funds obtained from USS, LLC to different accounts in different banks; also, a loan was provided to USS, LLC under loan agreement СИ-2009/60-3, dated July 10, 2009, (the total amount of the loan was 650 million rubles), and USS, LLC made regular payments under this loan.

In other words, there are specific indicators of a non-genuine document flow between the organizations with the intent to receive improper VAT benefits and to reduce the taxable income through a deliberate inclusion of CJSC NPO SINEF ENGINEERING into the list of USS, LLC counterparts during the acquisition of products.

In total, according to USS, LLC, 4,602.1 million rubles were transferred between 2009 and 2012 to CJSC NPO SINEF ENGINEERING under product delivery contract No. 2009/04-205, dated April 27, 2009.

Additionally, there are doubts about the legitimacy of certain deals USS, LLC entered with the offshore company, Solaricos Trading Limited (the Republic of Cyprus), through which USS, LLC sells manufactured products and purchases raw materials and equipment.

Specifically, for example, according to delivery contract No. S-2-2011, dated 24, 2011, and contracts No. 16И-2011/04-144, dated April 13, 2011, and No. 16-2011/04-142, dated April 13, 2011, in which USS, LLC acts as a buyer of raw material and equipment, 33,761.7 thousand US dollars (the equivalent of 1,099.8 million rubles) were transferred in total to the account of Solaricos Trading Limited (the Republic of Cyprus); later, they were returned on the same day (June 15, 2012) to the account of USS, LLC (the time period between the reception of the funds and the transfer of money to USS, LLC varied from 6 months to 18 months), including:

| Contracts (agreements) | Transferred in foreign currency from USS, LLC to Solaricos Trading Limited (in thou. US dollars) | | Returned (in mil. rubles, as a ruble equivalent of foreign currency) | |
| --- | --- | --- | --- | --- |
| | Date | Amount | Date | Amount |
| Delivery contract No. S-2-2011, dated January 24, 2011 | 01/24/2011 | 10,224.9 | 6/15/2012 | 333.1 |
| Contract No. 16И-2011/04-144, dated April 13, 2011 | 4/25/2011 7/4/2011 | 10,350.0 | 6/15/2012 | 337.2 |
| Contract No. 16-2011/04-142, dated April 13, 2011 | 4/25/2011 7/4/2011 | 13,186.8 | 6/15/2012 | 429.6 |
| Total | | 33,761.7 | | 1,099.9 |

The funds provided in this table (including 10,224.9 thousand US dollars; 10,350 thousand US dollars; and 13,186.8 thousand US dollars) were returned by Solaricos Trading Limited on June 15, 2012 (as the amount earlier transferred by USS, LLC under the aforementioned contracts) to account 40702840800021008410 held by USS, LLC in OJSC SBERBANK OF RUSSIA; from that account, they were transferred as early as June 18, 2012 to account No. 40702840500020008410 in OJSC SBERBANK OF RUSSIA as an export revenue transfer.

An opposite situation was also discovered where USS, LLC acted as a seller of products for which Solaricos Trading Limited transferred funds to USS, LLC, and USS, LLC returned the appropriate amounts to Solaricos Trading Limited after some time. It was discovered that such a situation transpired with the settlements made between these parties under two contracts with the total value of 4,004 thousand US dollars: contract No. 16И-2009/09-374, dated September 1, 2009, to ship (sell) 1,001 thousand US dollars worth of Grade B trichlorosilane; and contract No. 16-2010/04-110, dated April 6, 2010, to ship 3,003 thousand US dollars worth of silicon tetrachloride; in these deals, Solaricos Trading Limited transferred 2,128 thousand US dollars in total to USS, LLC. After a while (up to six months), the total volume of these funds was transferred back to the account of Solaricos Trading Limited.

| Contracts (agreements) | Transferred in foreign currency from USS, LLC to Solaricos | Returned (thou. US dollars) |
| --- | --- | --- |

| | Trading Limited (in thou. US dollars) | | | |
|---|---|---|---|---|
| | Date | Amount | Date | Amount |
| Contract No. 16И-2009/09-374, dated September 1, 2009 | 9/15/2009 9/21/2009 | 714.0 | 9/23/2009 | 714.0 |
| Contract No. 16-2010/04-110, dated April 6, 2010 | 4/22/2010 5/17/2010 7/15/2010 | 1,414.0 | 8/9/2010 1/28/2011 | 1,414.0 |
| Total | | 2,128.0 | | 2,128.0 |

The aforementioned facts regarding the contracts executed between USS, LLC and Solaricos Trading Limited provide grounds to suspect that USS, LLC received improper VAT refunds from the government.

Also, it was uncovered that the Russian Federation did not receive proper export proceeds under the contract with Solaricos Trading Limited.

Specifically, under contract No. 17-2008/01-6, dated January 10, 2008, the value of products estimated by the parties was 20 million Euros, and (judging from the records' analysis) USS, LLC had been selling Grade B trichlorosilane between February 4, 2008 and February 27, 2009; 954 tons of products were shipped and exported for a total amount of 70 million rubles (the equivalent of 1.8 million Euros), the delivery terms were DDU Merano Factory (Italy; the receiver was MEMK Elektronik Materiale).

Furthermore, according to USS, LLC data, the payment under this contract was 14.7 million rubles, which is 55.3 million rubles less than the cost of the exported product. A transfer request from Solaricos Trading Limited was provided as the payment record. It requested Raiffeisen Bank International AG (/AT403100007054095690) transfer 313.5 thousand Euros to USS, LLC, acct. No. 40702978523093000562 (OJSC ALFA-BANK), which is 1,521.0 thousand Euros less than the amount required to be paid under the contract.

It's worth noting that the number of employees in Solaricos Trading Limited, as of January 1, 2010 and January 1, 2011, was 2 people (the administrative and managerial staff); as of January 1, 2012, there was 1 person; and as of January 1, 2013, there were 0 people.

The contracts entered by USS, LLC and Insqu Production Limited to deliver production equipment are characterized by considerable margins.

For example, under contract No. 15B-2009/02-68, dated August 15, 2008, Insqu Production Limited acts as an equipment supplier (reactor parts, converters, transformers, etc.) and the total amount of the specification is 56.6 million US dollars for equipment list No. 1; and 5.4 million Euros for equipment list No. 2. The contract was discharged in full. The payment made by USS, LLC (expressed in rubles) was 1,741.9 million rubles. Judging from the information provided, the total payment for the equipment made by Insqu Production Limited under the contracts with its counterparts was 49.3 million

US dollars and 5.4 million Euros.

In 2008-2013, the value of contracts made between USS, LLC and Insqu Production Limited to deliver equipment and to provide services comprised 98.2 million US dollars and 12.1 million Euros. For the above period, the total amount of payments under the said contracts (according to USS, LLC data) was approximately 100 million US dollars (3,064.1 million rubles).

The following conclusions can be made with respect to the implementation of this project by OJSC RUSNANO:

At the pre-investment stage, due to the existing market risks associated with the set up of a polycrystalline silicon and silane production project and, more specifically, the existence of a competing block in the Western and Asian countries; the oversaturation of the PSP market; the unprofitability of production due to a considerable downward trend in the world prices (declined more than 25 times when compared to the pre-crisis 2008); and given the lack of innovation in the project, which is based on capital-intensive and costly western production technology, and that it is only indirectly related to nanotechnologies, this project was not an attractive investment in terms of the development of the nano-industry in Russia;

The investments made by OJSC RUSNANO, totaling 13.9 billion rubles, and provided to the project in 2009-2012 through a loan and the transfer to the Authorized Capital of Usolye-Sibirskoye Silicon, LLC, which was part of Nitol Group, LLC owned by offshore companies, were spent inefficiently; in essence, the money was spent to maintain an unprofitable group of companies, including the unprofitable Usolye-Sibirskoye Silicon, LLC, and to reduce its debt to lending institutions. During the project implementation, there were significant deviations from the key benchmarks (start-up and commissioning, reaching the design capacity). Currently, the project is unprofitable. It contributes to social tensions in the region and creates a risk of lost investments;

When compared to the original plans, the executive boards of GK Rusnanotekh adopted drastically different financial involvement parameters during the project implementation phase which included a new project organization and a new form of financial involvement in the project. As the result, in 2011, pursuant to the changes made to key project funding terms and to the application of legal schemes involving the execution of corresponding contracts, an additional 16 billion rubles were transferred to the project to purchase 100% of the Sherigo Resources Limited stock, which was appointed as the new project company (OJSC RUSNANO interest was 58.75%; OJSC SBERBANK CAPITAL interest was 41.25%); Sherigo Resources Limited transferred some of the obtained funds (15.8 billion rubles) to purchase the additional stock of Insqu Production Limited (the Republic of Cyprus), which is the sole owner of the Nitol Group, LLC parent capital. At the time of the purchase, the market value of 100% of the Nitol Group, LLC stock was 1 ruble (provisionally). These funds were transferred as a monetary contribution to USS, LLC (indirectly, through a contribution to the Nitol Group, LLC);

The financial policy exhibited by USS, LLC, the Nitol Group, LLC, and other resident and non-resident companies that are currently part of the group owned by the offshore project company Sherigo Resources Limited (OJSC RUSNANO interest is 58.25%), and the policy of giving and receiving

intragroup loans and entering into contracts with affiliated entities registered in offshore countries to purchase and deliver various products, contains the following elements: indicators of money laundering and a non-genuine document flow between the organizations with the intent to receive improper VAT benefits and to reduce taxable income by deliberately including an additional counterpart; and improper VAT refunds from the government for export-import transactions;

Given the company's practice of receiving and providing intragroup loans using obtained investments and borrowed credits, and the existing loan liabilities to USS, LLC (10,955.4 million rubles, as of December 31, 2012), an involuntary bankruptcy of the company in the not-so-distant future is quite possible.

### 8.7. RUSNANO own expenditures.

Therefore, the audited records confirm the findings of the RUSNANO Audit Commission that the company had excessive expenses which do not always match it business purposes and goals.

Furthermore, the RUSNANO expenditures exhibit deals with parties that have indirect and direct interest (under contracts approved by the executive boards). For example, between September 7, 2007 and September 22, 2008, L.B. Melamed was the General Director of Rusnanotekh; L.B. Melamed, the president of the Open Joint Stock Company Effortel, was appointed to serve as a member of the Supervisory Board of Rusnanotekh (upon confirmation) by order No.1649-p of the Russian government, dated November 12, 2008; in 2007-2008, he was a Board member of OJSC ALEMAR Managing Company.

In 2008-2009, to receive money from the Corporation, the project companies opened special accounts in OJSC Bank Alemar which was more than 50% owned by CJSC Limbrok, which was founded by L.B. Melamed with more than 50% ownership.

During the audited period, 9,351.11 million rubles and 4.31 million Euros were transferred in total by Rusnanotekh into special accounts of the project companies at OJSC Bank Alemar.

The audit did not find any document requiring the project companies to open accounts in this bank. Furthermore, under contract No.1406, dated December 24, 2008, made between Rusnanotekh and CJSC Alemar Investment and Finance Corporation, the latter provided project review consulting services to the Corporation. Specifically, the company conducted an express-analysis of 21 projects 8 of which received funding from RUSNANO.

The RUSNANO expenses for this contract reached 228.26 million rubles. The management of Rusnanotekh approved the contract with CJSC Alemar Investment and Finance Corporation (Minutes No.51, dated December 23, 2008).

9. Objections or comments made by the management of the audited entities regarding the audit findings.

The auditors compiled 3 reports which were provided to the OJSC RUSNANO management, including 2 reports about the interference with the audit of the Accounts Chamber of the Russian Federation.

The OJSC RUSNANO Audit Opinion was signed with comments for which a response was

provided.

10. Findings:

10.1. Rusnanotekh was created to implement the provisions of the Presidential Nano-Industry Development Strategy Initiative, dated April 24, 2007, the President V.V. Putin's Address to the Parliament of the Russian Federation, dated April 26, 2007, seeking to advance the public policy, to develop an innovative nanotechnology infrastructure, and to implement promising nanotechnology and nano-industry projects. In 2011, it was reorganized into OJSC RUSNANO with the Russian Federation being the sole stockholder.

10.2. During the Rusnanotekh reorganization, the Russian Ministry of Education and Science failed to comply with order No.2287-p of the Russian government, dated December 17, 2010, regarding the approvals and procedures to formulate the Authorized Capital of the newly created public corporation. As the result, Rusnanotekh acted individually, without a proper action of the founder, and used incorrect data to set the size of the Authorized Capital below the net value of assets by reducing it to 6.5 billion rubles which, in turn, allowed it to increase its unallocated profit from 4.2 billion rubles to 56 billion rubles and to create an appearance of sound financial standing in 2011-2012.

10.3. In 2007-2012, the funds accumulated by RUSNANO to finance its business purposes reached 259.5 billion rubles. They included: 111.8 billion rubles from the federal budget funds; 106 billion rubles of funds borrowed under the government guarantees; 41.7 billion rubles of other income coming from temporarily deposition of available assets. In 2007-2012, RUSNANO expenses were 196.1 billion rubles. During the expenditure, RUSNANO allowed deals with parties that had direct and indirect interest.

10.4. Despite the Audit Commission recommendations, the company's expenses in the first years were excessive. In 5 years, 6 billion rubles were spent on the administrative and business needs; 5.3 billion rubles were spent to accommodate personnel (building purchase and partial repair); 4 billion rubles were spent on different consulting and expert services; 560 million rubles were spent on security; 850 million rubles were spent on transportation; 7 billion rubles were spent on the payroll and social payments.

10.5. The actual RUSNANO investments for 2008-2012 were 284 billion rubles, which was 152 billion rubles more than the investments envisioned by the Rusnanotekh Strategy for this time period. However, the investment policy was not balanced and systematic. Specifically, to maximize the utilization of money in the reported period, a large portion of investments in 2008-2010 was made in December, in some cases without sufficient economic feasibility; as of now, some of the funded projects are deemed inefficient.

10.6. In 2008-2012, the total project investments made by RUSNANO and the co-investors was 265.98 billion rubles including: 134.05 billion rubles in cash paid by RUSNANO; 131.93 billion rubles provided by the co-investors (80.08 billion rubles (60.7%) were provided in kind as various assets; in many cases, their appraisal was overvalued).

RUSNANO provided to project companies 34.3 billion rubles in loans; however, the collateral received in many cases was overpriced and cannot be sold at the appraised value). Appraised at comparable time periods, the value of the same objects differed by several times.

10.7. Under 25 projects, RUSNANO transferred 47.3 billion rubles (35.3% of the total project funding) overseas to non-resident entities which, in turn, were supposed to transfer 73.3 billion rubles to

the Russian Federation. At the end of 2012, only 23 billion rubles (31.4% of the expected volume) were transferred to Russia. As of the audit time, no estimate of the economic benefits from these investments is possible.

Furthermore, it was discovered that, in some cases, the money coming to Russia from non-residents companies were subsequently transferred back overseas.

At the same time, the ratio of funding provided to leading Russian research agencies was insignificant. The number of proposals filed to receive RUSNANO funding over the last years was declining. It implies that applicants were losing interest in this endeavor.

10.8.  The RUSNANO project implementation monitoring system is not conducive for the efficient detection of improper expenditures. With the total project funding of 134.05 billion rubles, the RUSNANO management failed to take even one action to suspend project funding due to improper use of funds. Furthermore, a random audit of projects discovered instances when RUSNANO project companies transferred more than 1.2 billion rubles to entities that appear to be fly-by-nights.

With some project companies, even before their joint operations with RUSNANO has began, there was information in the reports regarding the assets and business evaluation that they use shell companies to move money out of the country, evade taxes, etc. Nevertheless, proposals filed by these companies received RUSNANO funding.

10.9.  Some of the OJSC RUSNANO projects involved the following: ineffective management and errors in investment decisions; economically unfeasible projects; unprofitability of the project companies and restructuring of their debt; distortion of the actual project performance results; funding Russian and foreign nanotechnology companies that were entering bankruptcies; proceeding with projects unrelated to nanotechnologies or having negative expert opinions.

The implementation of some RUSNANO projects begins to negatively affect the situation in the communities. For example, Usolye-Sibirskoye Silicone, LLC (Irkutsk Province), in a one-industry community, was almost entering bankruptcy. It received 13.9 billion rubles but failed to reach the designed capacity; there are job cuts which may lead to social unrest.

10.10.  In 2012, the OJSC RUSNANO loss was 24.3 billion rubles. It resulted from negative current financial performance of the company to the tune of 2.5 billion rubles, and the introduction of a reserve fund in the Miscellaneous Line Item to cover 21.8 billion rubles in depreciating assets.

In 2011, the loss per share was 0.4599 rubles; in 2012, it was 0.5313 rubles.

10.11.  There are internal regulations and the Intellectual Property Management and Protection Concept was approved. However, OJSC RUSNANO does not have complete information regarding the number on intellectual property items it received from the project companies.

10.12.  According to the Rusnanotekh Strategy, the volume of nanotechnology product sales in 2015 by the RUSNANO project companies was supposed to reach 300 billion rubles. In 2012, when the targeted goal was 10 billion rubles, the sales volume of the project companies reached 23.5 billion rubles. It was primarily achieved by increasing the number of the companies receiving funding. Many of them were already established companies and produced nano-products before they began to work on RUSNANO projects.

As of today, given the sales volume of the OJSC RUSNANO project companies and the pace

with which the projects reach their design capacities, it is obvious that the goal of 300 billion rubles will not be reached by 2015. Statistical reports used by the project companies to compile the nanotechnology products sales volume for OJSC RUSNANO are inconsistent and, in some cases, are doubtful.

10.13. The audited records indicate that OJSC RUSNANO insufficiently contributes to the development of the domestic nano-industry, and does not reach its goals.

11. Proposals:

11.1. Send the Accounts Chamber of the Russian Federation opinion to OJSC RUSNANO.

11.2. Send memoranda to:

The Government of the Russian Federation;

The Federal Financial Monitoring Service;

The Federal Agency for State Property Management

The Federal Tax Service.

11.3. Send the oversight audit findings to:

The Federation Council at the Federal Parliament of the Russian Federation,

The State Duma of the Federal Parliament of the Russian Federation.

11.4. Send the oversight audit records to:

The Office of the Prosecutor General of the Russian Federation;

The Investigation Committee of the Russian Federation;

The Ministry of Internal Affairs of the Russian Federation;

The Federal Security Service of the Russian Federation.

Auditor                          < *Signature* >           S.A. Agaptsov